# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF COLORADO

Civil Action No.

**ZOE JOHNSON**

      Plaintiff,

v.

**UNIVERSITY OF COLORADO,**
**TODD SALIMAN,** in his individual and official capacity as
President of University of Colorado;
**JUSTIN SCHWARTZ,** in his individual and official capacity as Chancellor of the
University of Colorado Boulder;
**LLEN POMEROY,** in her individual and official capacity as Associate Vice Chancellor for
the Office of Institutional Equity and Compliance and Title IX Coordinator;
**ELIZABETH K. SWANSON,** in her individual and official capacity as Associate Director
of Choral Activities at the University of Colorado Boulder,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Zoe Johnson ("Johnson") hereby brings this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the First and Fourteenth Amendments to the United States Constitution against all Defendants and alleges as follows:

### JURISDICTION & VENUE

1.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is actionable pursuant to 42 U.S.C. §§ 1983 and 1988.

2.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 2201, 1331, & 1343.

1

3. This Court is an appropriate venue pursuant 28 U.S.C. § 1391 because all Defendants reside here and a substantial portion of the events or omissions giving rise to Plaintiff Johnson's claims occurred here.

## PARTIES

1. Plaintiff Johnson is a citizen and resident of Golden, Colorado. She is currently a student at the University of Colorado, Boulder.

2. University of Colorado (the "University") is a public university organized and existing under the laws of the State of Colorado. The University is sued solely for injunctive relief, and not monetary damages.

3. Defendant Todd Saliman is the President of University of Colorado. Defendant Saliman is responsible for the enactment and enforcement of university policies, including the policy challenged here. Defendant Saliman is sued in his individual and official capacities.

4. Defendant Justin Schwartz is the Chancellor of the University of Colorado, Boulder. Defendant Schwartz is the "top academic leader of the University," "provides oversight of all academic, fiscal, and administrative duties," and reports directly to Defendant Saliman. Defendant Schwartz is sued in his individual and official capacities.

5. Defendant Llen Pomeroy is Associate Vice Chancellor for the Office of Institutional Equity and Compliance ("OIEC") and Title IX Coordinator at CU Boulder. Defendant Pomeroy is responsible for enforcing OIEC's policies, including its Nondiscrimination Policy. Defendant Pomeroy is sued in her individual and official capacities.

6. Defendant Elizabeth K. Swanson is the Associate Director of Choral Activities at the University of Colorado Boulder. Defendant Swanson, under OIEC's Policies and

2

Procedures, is considered a "responsible employee" required under OIEC's policies to report any potential violation of the University's Nondiscrimination Policy. Defendant Swanson is sued in her individual and official capacities.

## BACKGROUND

7. Colleges and universities were once known as places where open—and often uncomfortable—conversations could be had at a high level. Students and professors alike could engage in the "marketplace of ideas" to attain a better understanding of difficult and complex social issues without sacrificing educational freedoms.

8. Unfortunately, to the detriment of the commonly held belief that speech and debate "on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), public universities across America have begun to actively police and censor certain types of speech that the university itself deems unsavory or offensive.

9. Much of this censorship arises from the implementation of bias response teams and other university policies which prohibit certain types of "unwelcome" speech, sometimes referred to as campus speech codes.

10. Speech codes, known for using wide-sweeping, overly broad language that attacks both protected and unprotected speech, chill speech on university campuses through the imposition of content-based restrictions that come with harsh punishments. Indeed, mere invitations to meet with a university's faculty concerning a potential breach of a speech code chills student speech because the invitations carry "an implicit threat of consequence should a student decline the invitation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

11. Federal courts have not hesitated to strike down similar campus speech policies on constitutional grounds. *See, e.g., Speech First, Inc. v. Fenves*, 979 F.3d 319, 338–339 n.17 (5th Cir. 2020) (collecting cases where federal courts "have uniformly found campus speech codes unconstitutionally overbroad or vague").

12. Recognizing the futility and problems associated with having policies which police student speech, some state universities have begun to eliminate their speech codes and bias response teams due to their impact on First Amendment expression. Notably, in 2016, University of Northern Colorado put an end to their Bias Response Team program because the program "made people feel that we were telling them what they should and shouldn't say." The University of Northern Colorado made the decision to shut down its bias response teams because it could not enforce its policies "at the expense of free speech and academic freedom."

13. Other public universities have had to alter their policies after successful court challenges to their bias response team and speech code policies. *See, e.g., Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) (University of Michigan amended policy after Speech First, Inc. filed lawsuit against university); *Fenves*, 979 F.3d at 327 (University of Texas at Austin amended policy after Speech First, Inc. filed lawsuit against university).

14. The chilling impacts of speech codes and bias response teams is not limited to student speech. In 2013, the University, through its Title IX Office, pressured one of its professors to resign when Title IX administrators sat in to audit her class after receiving complaints from students regarding the content of the course.[1]

---

[1] Scott Jaschik, *Too Risky for Boulder?*, Inside Higher Ed (Dec. 15, 2013), http://www.insidehighered.com/news/2013/12/16/tenured-professor-boulder-says-she-being-forced-out-over-lecture-prostitution.

4

15. Here, through its OIEC and Nondiscrimination Policy, the University has created a hostile environment which discourages and punishes students and faculty for voicing an opinion that is considered disfavored and unpopular to the campus community at large.

## THE UNIVERSITY'S OIEC

16. In August 2014, the University created the OIEC "to integrate resolutions of all complaints against protected-class harassment and discrimination or sexual misconduct – whether against a student, employee, or affiliate – into one office."

17. The University's OIEC purportedly "plays a crucial role in creating a safe, more inclusive campus by driving awareness, education and support for students, faculty and staff and responding to behaviors prohibited by university policy." The goal of the office is to provide students with "a greater sense of inclusion, support and belonging" and attempts to accomplish this goal by "creat[ing] and foster[ing] a safe, inclusive, and accessible environment." In practice, it does the opposite.

18. According to the OIEC's Resolution Procedures, OIEC is the administrative body charged with implementing and enforcing various university policies, including the University of Colorado's Protected Class Nondiscrimination Policy (APS 5065).

19. Complaints of violations of any policy under the purview of OIEC can be made by emailing OIEC directly, calling OIEC, or by completing the online form available through OIEC's website.

20. Students and select faculty are encouraged to file a complaint with OIEC if they have knowledge of any conduct prohibited by the policies which OIEC maintains authority over.

5

21. Once a report is filed with OIEC, it has the discretion to conduct a preliminary investigation into the allegations of the report, which consists of a determination of the report implicates a policy within the purview of OIEC's jurisdiction.

22. After OIEC conducts its preliminary investigation, OIEC's investigation will proceed to the one of the following phases: (1) formal grievance process; (2) policy compliance remedies; (3) adaptable resolutions; and (4) referrals and other remedies.

23. All of OIEC's investigations are handled by "trained officials" who allegedly "do not have a conflict of interest or bias for or against the complainant or respondent, or against complainants or respondents generally."

24. OIEC, and its investigators, attempt to address "allegations with respondents through education resolutions that promote an inclusive culture at the university, including being respectful of differences and identifying strategies to manage conflict that cultivate a safe, inclusive, and accessible campus environment for all members of the CU Boulder community."

25. Regardless of what investigation method is ultimately used by OIEC, if a policy violation is found, OIEC will issue some form of "punishment" on the offending party, such as written reprimands, forced attendance of educational courses, suspension, disciplinary probation, and educational programming or training as necessary.

26. Within the past few months, the University's OIEC has come under scrutiny for its complete failure to address and resolve complaints of discrimination, harassment, and inequity that are prevalent on the University's campus.[2]

27. On Friday, January 24, 2025, the University of Colorado announced it was renaming its OIEC to the Office of Collaboration, apparently in an effort to avoid any association with controversial DEI initiatives. The office's new name is nothing more than a cosmetic change, as the purpose of the "new" Office of Collaboration is to ensure University of Colorado campuses have "diverse and inclusive working and learning environments." There appears to be no change in policy, procedures or staff.

28. In fact, the University of Colorado's Strategic Plan for 2021-2026, emphasizes that the University of Colorado will focus on DEI initiatives rather than other initiatives that benefit the university as a whole.

## THE UNIVERSITY'S NONDISCRIMINATION POLICY

29. The University's Protected Class Nondiscrimination Policy (the "Policy") "prohibits discrimination and harassment on the basis of race, color national origin, sex age disability, creed, religion, veteran status, marital status, political affiliation, political philosophy, pregnancy or related conditions, sexual orientation, gender identity and gender expression[.]" The purpose of the policy is "to ensure equal access to the academic and professional experiences at the university[.]"

---

[2] Hillary Potter, *CU Boulder has Failed for Years to Address, Discrimination, Harassment, Inequity and Retaliation*, The Denver Post: Opinion (Sept. 19, 2024), http://www.denverpost.com/2024/09/19/cu-harassment-discrimination-complaints-leadership-failed-investigate/.

7

30. Under Section II of the Policy, "discrimination and harassment based on protected class" are considered prohibited conduct.

31. For purposes of the Policy, protected classes means "race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, marital status, political affiliation, and political philosophy." The Policy then provides separate definitions for each of the seventeen classes the Policy identifies as protected. For example, "sexual orientation" is defined as "an individual's physical, romantic, and/or emotional attraction toward people. Examples include, but are not limited to: heterosexual, bisexual, gay, lesbian, pansexual, asexual, queer, demisexual, or questioning."

32. The Policy defines "harassment on the basis of protected class" as "unwelcome, verbal, written, or physical conduct based on one's protected class that unreasonably interferes with an individual's work or academic performance or creates an intimidating or hostile or educational environment."

33. The Policy further explains that a "hostile environment is a form of harassment" and exists when an individual experiences "unwelcome conduct."

34. The Policy does not define nor explain what constitutes "unwelcome conduct."

35. Under the Policy both students and faculty can report allegations of prohibited conduct to OIEC. Reporting can be accomplished by directly contacting OIEC via email and phone or by completing an online form available through OIEC's website.

36. Once a complaint has been filed, OIEC will assume jurisdiction and begin its investigation.

37. Prior to any formal investigation, OIEC maintains authority to issue either supportive or safety measures as a temporary solution for any reports of violations regarding the Policy.

38. Supportive measures are "non-disciplinary, non-punitive individualized services . . . designed to restore or preserve equal access to the university's education program or activity without unreasonably burdening the other party[.]" But safety measures include varying degrees of punishment including, but not limited to suspension of the respondent, and exclusion from campus, residence halls, and classes.

39. The Policy mandates that certain faculty members, referred to as "responsible employees," "who witness[] or receive[] a written or oral report alleging that a member of the university community has been subjected to or has committed an act of prohibited conduct must promptly report the allegations to the Equity Office."

40. Notably, if the complaining student decides not to pursue her complaint with OIEC after filing, OIEC will "weigh that request against the university's obligation to provide a safe, non-discriminatory environment," and potentially overrule the complainant's request.

41. Once OIEC has received the complaint, it will conduct a preliminary inquiry to determine whether the Policy has been violated and whether the complaint and parties fall within the jurisdiction of OIEC. A preliminary inquiry can include a meeting with the complainant and respondent to gather additional information.

42. If OIEC determines sufficient evidence exists that a violation of the Policy occurred, it may proceed to the formal grievance procedure where the Respondent will be notified in writing of the allegations against her and participate in the process of collecting

9

evidence through review of applicable school records and interviews with the parties and witnesses, if any.

43. If the OIEC investigator determines the Respondent did violate the Policy, the matter will be referred to the sanctioning board to determine punishment. Sanctions for violation of the Policy include: written reprimand, educational sanctions (forced attendance of training program regarding protected-class harassment), meeting with Senior Director of Support and Safety Measures, Residence Hall Reassignment, Residence Hall Termination, Formal Disciplinary Probation, Restriction or Denial of University Services, suspension, expulsion, and disciplinary hold on the respondent's student record and account.

## PLAINTIFF JOHNSON'S EXPERIENCE WITH OIEC

44. Plaintiff Johnson is a third year undergraduate student at the University and is a member of the University's choir ensemble.

45. Since Freshman year, Zoe has participated in the University's choir ensemble which Defendant Swanson leads.

46. Plaintiff Johnson enjoys choir ensemble, but sometimes disagrees with the direction Defendant Swanson leads the ensemble.

47. For example, on or about September 9, 2022, during choir practice, Plaintiff Johnson was talking with a fellow choir member when Plaintiff Johnson said something akin to: "I don't care about your identity, I care more about what you have to say as a person, more than how you look." A choir member overheard Plaintiff Johnson's statement and privately complained to Defendant Swanson that Plaintiff Johnson had made a discriminatory comment

10

regarding people of color. That choir member did not confront Johnson personally and remains unidentified.

48.     On September 16, 2022, Defendant Swanson met with Plaintiff Johnson regarding the statement and, over the course of twenty minutes, proceeded to shame Plaintiff Johnson for her comment and her "white privilege," stating that Plaintiff Johnson could never understand the struggles people of color face.

49.     Then, in October 2024, during choir rehearsal, Plaintiff Johnson had an encounter with another member of the choir ensemble. The ensemble's lesson that day involved a discussion on LGBTQ Pride and the history of Pride. During a discussion with other members of the ensemble, Plaintiff Johnson, seeking to inquire more information about the day's lesson, asked: "Why do we need two months of this? Didn't we do this back in June?" Apparently, unidentified students of the ensemble took offense to Plaintiff Johnson's question and secretly reported her to Defendant Swanson.

50.     Later, on a separate date, a male student wore a pink wave cap (also known as a do-rag) to choir ensemble practice. Zoe, having never seen a wave cap before, turned to one of her classmates and asked her what the male student was wearing. The classmate found Zoe's question to be offensive and reported her comment to Defendant Swanson.

51.     On October 30, 2024, Plaintiff Johnson received an email from Defendant Swanson, asking if Plaintiff Johnson had time to speak with her one on one regarding a "few concerns." Defendant Swanson's email did not explain any further as to what the concerns were. Plaintiff Johnson, confused by Defendant Swanson's email, asked if Defendant Swanson could provide further information on the concerns she mentioned. *See* Ex. 1.

11

52. Defendant Swanson explained that "some fellow choir members brought concerns" to her that she wanted to discuss privately with Plaintiff Johnson. Once again, Defendant Swanson shared neither the content nor details about the complaint against Plaintiff Johnson. Believing she done nothing wrong, Plaintiff Johnson politely and respectfully declined to meet with Defendant Swanson, stating "I truly never meant to hurt anyone but I believe that students should have the emotional maturity to resolve any issues they have with me on their own." In a series of increasingly harassing emails, Defendant Swanson continued to pressure Plaintiff Johnson into meeting with her. After Plaintiff Johnson repeatedly declined, Defendant Swanson informed Plaintiff Johnson that she reported her to OIEC and threatened to remove her from the choral ensemble if her behavior continued. *Id.*

53. On November 4, 2024, Plaintiff Johnson received an email from an investigator with OIEC seeking to schedule a time to discuss "concerns reported into [OIEC] involving comments [Zoe] made to other students relating to protected class identities." In response, Plaintiff Johnson asked if there would be any consequences if she chose not to attend the meeting. The OIEC investigator then told Plaintiff Johnson that was required to attend the meeting according to CU's Protected Class Nondiscrimination Policy and that failure to attend would result in Plaintiff Johnson being formally charged with a violation of the Protected Class Nondiscrimination Policy with the potential for sanctions under Provision II(C)1. of the Policy. Provision II(C)1. of the Policy reads: "**Failure to Comply with Orders or Sanctions:** Not complying with orders of the Equity Office or other appropriate university officials related to this Policy including, but not limited to, No-Contact Orders, Exclusion Orders, and

12

Orders for Interim Suspension." Other potential sanctions can include the placement of a hold on a student's school account, preventing the student from registering for classes. *See* Ex. 2.

54. Plaintiff Johnson agreed to meet with OIEC to discuss the allegations that had been made against her. She only did so, however, because she was advised that if she failed to meet, she would be prevented from registering for classes for the upcoming semester. Notably, OIEC threatened to place a hold on her student account despite informing her that she had not violated any University policy.

55. On November 6, 2024, Plaintiff Johnson, along with her parents and legal counsel, met with two investigators from OIEC over Zoom. During the meeting, the investigators told Plaintiff Johnson her comments, regardless of the harmless intent behind them, constituted harassment under the University's Nondiscrimination Policy. Though OIEC informed Plaintiff Johnson at this meeting that it would not be investigating the allegations against her, the investigators repeatedly told Plaintiff Johnson that she needs to censor her own speech in the future to avoid future complaints with OIEC.

56. Though Plaintiff Johnson was not punished beyond the mandatory "educational meeting" with OIEC, she now lives in constant fear that anything she says could be considered "unwelcome conduct" under the Policy which would lead to another complaint and potential investigation by OIEC. Plaintiff Johnson knows other students in a similar situation who keep their beliefs to themselves out of fear they will be investigated by OIEC for merely sharing their beliefs.

## COUNT I: FIRST AMENDMENT RETALIATION

57. Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

58. To establish a claim for First Amendment retaliation against a non-employer, a plaintiff must plead: "(1) that the 'plaintiff was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2010) (quoting *Lackey v. Cnty. of Bernalillo*, No. 97-2265, 1999 WL 2461, at *3 (10th Cir. Jan. 5, 1999)).

59. Plaintiff Johnson engaged in constitutionally protected First Amendment activity when she asked questions during choir ensemble regarding the significance of a Pride celebration and an article of clothing another student was wearing.

60. For engaging in the above descried protected activity, Defendant Swanson referred Plaintiff Johnson to the University's OIEC for punishment to prevent Plaintiff Johnson from engaging in similar activity in the future.

61. Defendant Swanson referred Plaintiff Johnson to OIEC for punishment specifically because Johnson engaged in protected First Amendment speech that Swanson did not approve of.

62. Being reported to the OIEC as a direct consequence of Plaintiff engaging in protected First Amendment activity constitutes unlawful retaliation.

14

63. Defendant Swanson's retaliatory actions against Plaintiff Johnson have caused her to suffer damages.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT
**(Nondiscrimination Policy)**

64. Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

65. A bedrock principle of the First Amendment is that any policy or law attempting to control speech must be sufficiently tailored to exclusively abridge unprotected speech. Any policy which fails to distinguish between protected and unprotected speech violates the First Amendment and must be struck down.

66. Here, the Policy violates the First Amendment. By its plain terms, the Policy applies to protected speech; it is unconstitutionally overbroad. Virtually any opinion or belief, regardless of the speaker's intent, could be classified as "unwelcome" and constitute harassment or discrimination under the Policy.

67. By attempting to limit "unwelcome" speech relating to an individual's race, ethnicity, gender, sexual orientation, etc., the University has created a policy that constitutes an impermissible restraint based on the content and viewpoint of the subject speech.

68. The University has no compelling interest in curtailing such speech. Even if it did, such interest is not narrowly tailored to the type of speech it seeks to restrict.

69. Equally egregious, the Policy punishes students for engaging in protected speech with the threat of forced participation in educational courses, removal from campus life, suspension, or expulsion. The mere possibility and threat of punishment for expressing an opinion, unpopular or not, or satire only serves to chill protected speech by deterring

students from speaking their minds on relevant topics and thus limiting students' educational freedom.

70. Plaintiff Johnson was referred to OIEC for violating the Policy after engaging in protected speech by asking a clarifying question about Pride Day at choir rehearsal.

71. Relying on Provision II(C)1. of the Policy, the OIEC investigator threatened Plaintiff Johnson with sanctions in order to compel her attendance at a meeting with OIEC.

72. Due to the disparate treatment Plaintiff Johnson received by Defendant Swan and OIEC, Plaintiff Johnson is now concerned that she could be punished for simply expressing her opinion or inquiring about "controversial" topics and is less likely to speak on matters of public concern out of fear of further punishment.

73. Defendants adopted the Policy under color of state law.

## COUNT III: VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: VOID FOR VAGUENESS
**(Nondiscrimination Policy)**

74. Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

75. Any law which restricts the First Amendment must clearly define its prohibitions and clearly establish which conduct is and is not prohibited.

76. A law can be found to be void for vagueness when either: (1) "'fails to provide ordinary people of intelligence a reasonable opportunity to understand what conduct it prohibits'" and (2) "'if it authorizes or encourages arbitrary and discriminatory enforcement.'" *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'When speech is involved, rigorous adherence to those

16

requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012)).

77. By failing to define "unwelcome conduct," the University has failed to put students on notice of the specific speech that could constitute a violation of the University's Nondiscrimination Policy. The Policy is unconstitutionally vague and therefore unconstitutional.

78. As written, the Policy fails to put students and employees on notice that their speech could be considered "unwelcome conduct" and violate the Policy.

79. Further, the Policy allows for inconsistent application as there is no definition OIEC investigators can consistently apply to reports to determine whether a respondent's actions constituted "unwelcome conduct" or created a hostile environment for the complainant. Under the current version of the Policy, two different investigators could potentially come to different conclusions on whether certain conduct violates the Policy.

80. Defendants adopted the Policy under color of state law.

## JURY TRIAL DEMAND

81. Plaintiff Johnson demands a jury trial on all counts so triable.

## PRAYER FOR RELIEF

Plaintiff Johnson prays this Court enters judgment in her favor and awards the following relief:

i. A declaratory judgment that the University's Anti-Discrimination Policy violates the First and Fourteenth Amendments to the U.S. Constitution;

17

      ii.      A permanent injunction barring Defendants from enforcing its Nondiscrimination Policy;

      iii.      A preliminary injunction granting the relief specified above during the pendency of this action;

      iv.      Monetary damages;

      v.      Attorney's fees and pursuant to 42 U.S.C. § 1988, and all other applicable law; and,

      vi.      Any further relief this Court deems necessary and appropriate.

Dated: February 5, 2025.

                                      Respectfully submitted,

                                      */s/ Geoffrey N. Blue*
                                      Geoffrey N. Blue
                                      Colorado Bar No. 32684
                                      Tel. (303) 906-1050
                                      Scott Gessler
                                      Colorado Bar No. 28944
                                      Tel. (720) 839-6637
                                      **GESSLER BLUE LLC**
                                      Attorneys for Plaintiff
                                      7350 E. Progress Pl., Suite 100
                                      Greenwood Village, Colorado 80111
                                      gblue@gesslerblue.com
                                      sgessler@gesslerblue.com

Matthew Seth Sarelson
Florida Bar 888281
**DHILLON LAW GROUP, INC.**
Attorneys for Plaintiff
1601 Forum Place, Suite 403
West Palm Beach, Florida 33401
305.773.1952
msarelson@dhillonlaw.com
*Admission Pending*


*/s/ John-Paul S. Deol*
John-Paul S. Deol
California Bar 284893
**DHILLON LAW GROUP, INC.**
Attorneys for Plaintiff
177 Post Street, Suite 700
San Francisco, California 94108
415.741.7935
jpdeol@dhillonlaw.com



Madison Hahn, Esq.
**Young America's Foundation**
11480 Commerce Park Dr., Suite 600
Reston, Virginia 20191
mhahn@yaf.org
Te. 800.872.1776
*Admission Pending*