**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLORADO**

Case No.: 1:25-cv-00390-GPG-NRN

**ZOE JOHNSON**

      Plaintiff,

v.

**UNIVERSITY OF COLORADO,
JUSTIN SCHWARTZ,
in his official capacity as Chancellor of
the University of Colorado Boulder;
LLEN POMEROY, in her individual capacity,
ELIZABETH K. SWANSON, in her individual capacity;
SEQUOIA K. HILL, in her individual capacity; and
DANIE EDWARDS, in her individual capacity,**

      Defendants.

---

### AMENDED COMPLAINT

---

Plaintiff Zoe Johnson ("Johnson") hereby brings this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the First and Fourteenth Amendments to the United States Constitution against all Defendants and alleges as follows:

### JURISDICTION & VENUE

1.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is actionable pursuant to 42 U.S.C. §§ 1983 and 1988.

2.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 2201, 1331, & 1343.

3.      This Court is an appropriate venue pursuant 28 U.S.C. § 1391 because all Defendants reside here and a substantial portion of the events or omissions giving rise to Plaintiff Johnson's claims occurred here.

## PARTIES

4.      Plaintiff Johnson is a citizen and resident of Golden, Colorado. She is currently a student at the University of Colorado Boulder.

5.      University of Colorado (the "University") is a public university organized and existing under the laws of Colorado. The University is sued solely for injunctive relief, and not monetary damages.  The unlawful policy at issue is a system-wide policy.

6.      Defendant Justin Schwartz is the Chancellor of the University of Colorado, Boulder. Defendant Schwartz is the "top academic leader of the University," "provides oversight of all academic, fiscal, and administrative duties." Defendant Schwartz is sued in his official capacity.  Schwartz is sued solely for injunctive relief, and not monetary damages.  While the unlawful policy is a system-wide policy, enforcement is handling at the school level through CU Boulder's OEIC.  Schwartz is ultimately responsibility for the OEIC.

7.      Defendant Llen Pomeroy is Associate Vice Chancellor for the Office of Institutional Equity and Compliance ("OIEC") and Title IX Coordinator at CU Boulder. As Vice Chancellor of the OIEC, Defendant Pomeroy is charged with "addressing and preventing protected-class discrimination." Defendant Pomeroy actively participates in all investigations OIEC conducts and has a say in all decisions made by her staff with regards to enforcement of OIEC's policies. Defendant Pomeroy is responsible for

enforcing OIEC's policies, including its Nondiscrimination Policy. Defendant Pomeroy is sued in her individual capacity.

8.      Defendant Elizabeth K. Swanson is the Associate Director of Choral Activities at the University of Colorado Boulder. Defendant Swanson, under OIEC's Policies and Procedures, is considered a "responsible employee" required under OIEC's policies to report any potential violation of the University's Nondiscrimination Policy. Defendant Swanson is sued in her individual capacity.

9.      Defendant Sequoia K. Hill is an Investigator and Case Resolution Specialist for CU Boulder's OIEC. As part of her duties, Defendant Hill investigates potential violations of OIEC's policies, including OIEC's Nondiscrimination Policy. Defendant Hill is sued in her individual capacity.

10.     Defendant Danie Edwards is a Senior Investigator and Case Resolutions Specialist for CU Boulder's OIEC. As part of her duties, Defendant Hill investigates potential violations of OIEC's policies, including OIEC's Nondiscrimination Policy. Edwards was, upon information and belief, Defendant Hill's supervisor or at least her senior.  Defendant Edwards is sued in her individual capacity.

## **BACKGROUND**

11.     Colleges and universities were once known as places where open—and often uncomfortable—conversations could be had at a high level. Students and professors alike could engage in the "marketplace of ideas" to attain a better understanding of difficult and complex social issues without sacrificing educational freedoms.

3

12.     Unfortunately, to the detriment of the commonly held belief that speech and debate "on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), public universities across America have begun to actively police and censor certain types of speech that the university itself deems unsavory or offensive.

13.     Much of this censorship arises from the implementation of bias response teams and other university policies which prohibit certain types of "unwelcome" speech, sometimes referred to as campus speech codes.

14.     Speech codes, known for using wide-sweeping, overly broad language that attacks both protected and unprotected speech, chill speech on university campuses through the imposition of content-based restrictions that come with harsh punishments. Indeed, mere invitations to meet with a university's faculty concerning a potential breach of a speech code chills student speech because the invitations carry "an implicit threat of consequence should a student decline the invitation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

15.     Federal courts have not hesitated to strike down similar campus speech policies on constitutional grounds. *See, e.g., Speech First, Inc. v. Fenves*, 979 F.3d 319, 338–339 n.17 (5th Cir. 2020) (collecting cases where federal courts "have uniformly found campus speech codes unconstitutionally overbroad or vague").

16.     Recognizing the futility and problems associated with having policies which police student speech, some state universities have begun to eliminate their speech codes and bias response teams due to their impact on First Amendment expression. Notably, in 2016, University of Northern Colorado put an end to their Bias Response Team

program because the program "made people feel that we were telling them what they should and shouldn't say." The University of Northern Colorado made the decision to shut down its bias response teams because it could not enforce its policies "at the expense of free speech and academic freedom."

17.    Other public universities have had to alter their policies after successful court challenges to their bias response team and speech code policies. *See, e.g., Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) (University of Michigan amended policy after Speech First, Inc. filed lawsuit against university); *Fenves*, 979 F.3d at 327 (University of Texas at Austin amended policy after Speech First, Inc. filed lawsuit against university).

18.    The chilling impacts of speech codes and bias response teams are not limited to student speech. In 2013, the University, through its Title IX Office, pressured one of its professors to resign when Title IX administrators sat in to audit her class after receiving complaints from students regarding the content of the course.[1]

19.    Here, through its OIEC and Nondiscrimination Policy, the University has created a hostile environment which discourages and punishes conservative students and faculty for voicing an opinion that is considered disfavored and unpopular to the campus community at large.

---

[1]    Scott Jaschik, *Too Risky for Boulder?*, Inside Higher Ed (Dec. 15, 2013), http://www.insidehighered.com/news/2013/12/16/tenured-professor-boulder-says-she-being-forced-out-over-lecture-prostitution (last visited May 23, 2025).

**THE OIEC**

20.    In August 2014, CU Boulder created the OIEC "to integrate resolutions of all complaints against protected-class harassment and discrimination or sexual misconduct – whether against a student, employee, or affiliate – into one office."

21.    The OIEC purportedly "plays a crucial role in creating a safe, more inclusive campus by driving awareness, education and support for students, faculty and staff and responding to behaviors prohibited by university policy."  The goal of the office is to provide students with "a greater sense of inclusion, support and belonging" and attempts to accomplish this goal by "creat[ing] and foster[ing] a safe, inclusive, and accessible environment."  In practice, it does the opposite.

22.    According to the OIEC's Resolution Procedures, OIEC is the administrative body charged with implementing and enforcing various university policies, including the University's Protected Class Nondiscrimination Policy (APS 5065).

23.    Complaints of violations of any policy under the purview of OIEC can be made by emailing OIEC directly, calling OIEC, or by completing the online form available through OIEC's website.

24.    Students and select faculty are encouraged to file a complaint with OIEC if they have knowledge of any conduct prohibited by the policies which OIEC maintains authority over.

25.    Once a report is filed with OIEC, it has the discretion to conduct a preliminary investigation into the allegations of the report, which consists of a determination of the report implicating a policy within the purview of OIEC's jurisdiction.

26.     After OIEC conducts its preliminary investigation, OIEC's investigation will proceed to the one of the following phases: (1) formal grievance process; (2) policy compliance remedies; (3) adaptable resolutions; and (4) referrals and other remedies.

27.     All of OIEC's investigations are handled by "trained officials" who allegedly "do not have a conflict of interest or bias for or against the complainant or respondent, or against complainants or respondents generally."

28.     OIEC, and its investigators, attempt to address "allegations with respondents through education resolutions that promote an inclusive culture at the university, including being respectful of differences and identifying strategies to manage conflict that cultivate a safe, inclusive, and accessible campus environment for all members of the CU Boulder community."

29.     Regardless of what investigation method is ultimately used by OIEC, if a policy violation is found, OIEC will issue some form of "punishment" on the offending party, such as written reprimands, forced attendance of educational courses, suspension, disciplinary probation, and educational programming or training as necessary.

30.     Recently, OIEC has come under scrutiny for its complete failure to address and resolve complaints of discrimination, harassment, and inequity that are prevalent on the University's campus.[2]

31.     Upon information and belief, the OIEC targets and investigates students who express conservative views or hold opinions that are otherwise considered

---

[2]     Hillary Potter, *CU Boulder has Failed for Years to Address, Discrimination, Harassment, Inequity and Retaliation*, The Denver Post: Opinion (Sept. 19, 2024), http://www.denverpost.com/2024/09/19/cu-harassment-discrimination-complaints-leadership-failed-investigate/.

"unpopular" on campus instead of resolving real issues of discrimination, harassment, and inequity.  The policy serves as an unlawful speech code.

32.     It appears the University or CU Boulder have no intention of resolving any genuine discrimination issues, as the University's Strategic Plan for 2021-2026, emphasizes that the University will focus on DEI initiatives rather than other initiatives that benefit the university as a whole.

## THE UNIVERSITY'S NONDISCRIMINATION POLICY

33.     The University's Protected Class Nondiscrimination Policy (the "Policy") "prohibits discrimination and harassment on the basis of race, color national origin, sex age disability, creed, religion, veteran status, marital status, political affiliation, political philosophy, pregnancy or related conditions, sexual orientation, gender identity and gender expression[.]" The purpose of the policy is "to ensure equal access to the academic and professional experiences at the university[.]"

34.     Under Section II of the Policy, "discrimination and harassment based on protected class" are considered prohibited conduct.

35.     For purposes of the Policy, protected classes mean "race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, marital status, political affiliation, and political philosophy." The Policy then provides separate definitions for each of the seventeen classes the Policy identifies as protected. For example, "sexual orientation" is defined as "an individual's physical, romantic, and/or emotional attraction toward people. Examples include, but are not limited to: heterosexual, bisexual, gay, lesbian, pansexual, asexual, queer, demisexual, or questioning."

36.    The Policy defines "harassment on the basis of protected class" as "unwelcome, verbal, written, or physical conduct based on one's protected class that unreasonably interferes with an individual's work or academic performance or creates an intimidating or hostile or educational environment."

37.    The Policy further explains that a "hostile environment is a form of harassment" and exists when an individual experiences "unwelcome conduct."

38.    The Policy does not define nor explain what constitutes "unwelcome conduct."

39.    Under the Policy both students and faculty can report allegations of prohibited conduct to OIEC. Reporting can be accomplished by directly contacting OIEC via email and phone or by completing an online form available through OIEC's website.

40.    Once a complaint has been filed, OIEC will assume jurisdiction and begin its investigation.

41.    Prior to any formal investigation, OIEC maintains authority to issue either supportive or safety measures as a temporary solution for any reports of violations regarding the Policy.

42.    Supportive measures are "non-disciplinary, non-punitive individualized services . . . designed to restore or preserve equal access to the university's education program or activity without unreasonably burdening the other party[.]" But safety measures include varying degrees of punishment including, but not limited to suspension of the respondent, and exclusion from campus, residence halls, and classes.

43.    The Policy mandates that certain faculty members, referred to as "responsible employees," "who witness[] or receive[] a written or oral report alleging that

a member of the university community has been subjected to or has committed an act of prohibited conduct must promptly report the allegations to the Equity Office."

44.     Notably, if the complaining student decides not to pursue his or her complaint with OIEC after filing, OIEC will "weigh that request against the university's obligation to provide a safe, non-discriminatory environment," and potentially overrule the complainant's request.

45.     Once OIEC has received the complaint, it will conduct a preliminary inquiry to determine whether the Policy has been violated and whether the complaint and parties fall within the jurisdiction of OIEC. A preliminary inquiry can include a meeting with the complainant and respondent to gather additional information.

46.     If OIEC determines that sufficient evidence exists that a violation of the Policy occurred, it may proceed to the formal grievance procedure where the Respondent will be notified in writing of the allegations against him or her and participate in the process of collecting evidence through review of applicable school records and interviews with the parties and witnesses, if any.

47.     If the OIEC investigator determines the Respondent did violate the Policy, the matter will be referred to the sanctioning board to determine punishment. Sanctions for violation of the Policy include: written reprimand, educational sanctions (forced attendance of training program regarding protected-class harassment), meeting with Senior Director of Support and Safety Measures, Residence Hall Reassignment, Residence Hall Termination, Formal Disciplinary Probation, Restriction or Denial of University Services, suspension, expulsion, and disciplinary hold on the respondent's student record and account.

48.    Upon information and belief, the OIEC targets and investigates students who express conservative views or hold opinions that are otherwise considered "unpopular" on campus and charges them with violations of the Nondiscrimination Policy. It constitutes a vague and arbitrary speech code selectively enforced against those holding what it considers wrong opinions.

**PLAINTIFF JOHNSON'S EXPERIENCE WITH OIEC**

49.    Plaintiff Johnson is a third-year undergraduate student at CU Boulder and is a member of the choir ensemble.

50.    Plaintiff Johnson considered herself to be a conservative and holds opinions and beliefs that are considered unpopular, or in the minority, on campus.

51.    Since Freshman year, Plaintiff Johnson has participated in the choir ensemble which Defendant Swanson leads.

52.    Plaintiff Johnson enjoys choir ensemble but sometimes disagrees with the direction Defendant Swanson leads the ensemble.

53.    For example, on or about September 9, 2022, during choir practice, Plaintiff Johnson was talking with a fellow choir member when Plaintiff Johnson said something akin to: "I don't care about your identity, I care more about what you have to say as a person, more than how you look." A choir member overheard Plaintiff Johnson's statement and privately complained to Defendant Swanson that Plaintiff Johnson had made a discriminatory comment regarding people of color.  That choir member did not confront Plaintiff Johnson personally and remains unidentified.

54.    On September 16, 2022, Defendant Swanson met with Plaintiff Johnson regarding the statement and, over the course of twenty minutes, proceeded to shame

Plaintiff Johnson for her comment and her "white privilege," stating that Plaintiff Johnson could never understand the struggles people of color face.

55.     Then, in October 2024, during choir rehearsal, Plaintiff Johnson had an encounter with another member of the choir ensemble. The ensemble's lesson that day involved a discussion on LGBTQ Pride and the history of Pride. During a discussion with other members of the ensemble, Plaintiff Johnson, seeking to inquire more information about the day's lesson, asked: "Why do we need two months of this? Didn't we do this back in June?" Apparently, unidentified students of the ensemble took offense to Plaintiff Johnson's question and secretly reported her to Defendant Swanson.

56.     Later, on a separate date, a male student wore a pink wave cap (also known as a do-rag) to choir ensemble practice. Plaintiff Johnson, having never seen a wave cap before, turned to one of her classmates and asked her what the male student was wearing. The classmate found Plaintiff Johnson's question to be offensive and reported her comment to Defendant Swanson, who later reported the comment to the OIEC.

57.     On October 30, 2024, Plaintiff Johnson received an email from Defendant Swanson, asking if Plaintiff Johnson had time to speak with her one on one regarding a "few concerns." Defendant Swanson's email did not explain any further as to what the concerns were. Plaintiff Johnson, confused by Defendant Swanson's email, asked if Defendant Swanson could provide further information on the concerns she mentioned. *See* Exh. 1, Email chain between E. Swanson and Z. Johnson, 10/30/24-11/1/24 (the "Swanson Email").

58.     Defendant Swanson explained that "some fellow choir members brought concerns" to her that she wanted to discuss privately with Plaintiff Johnson. *Id.* Once

again, Defendant Swanson shared neither the content nor details about the complaint against Plaintiff Johnson. Believing she had done nothing wrong, Plaintiff Johnson politely and respectfully declined to meet with Defendant Swanson, stating "I truly never meant to hurt anyone, but I believe that students should have the emotional maturity to resolve any issues they have with me on their own." *Id.* In a series of increasingly harassing emails, Defendant Swanson continued to pressure Plaintiff Johnson into meeting with her. After Plaintiff Johnson repeatedly declined, Defendant Swanson informed Plaintiff Johnson that she reported her to OIEC and threatened to remove her from the choral ensemble if her behavior continued. *Id.*

59.    On November 4, 2024, Plaintiff Johnson received an email from Defendant Hill seeking to schedule a time to discuss "concerns reported into [OIEC] involving comments [Zoe] made to other students relating to protected class identities."[3] In response, Plaintiff Johnson asked if there would be any consequences if she chose not to attend the meeting, implying that she was declining to attend.[4]

60.    In retaliation for Plaintiff Johnson implying she was going to decline to meet with the OIEC, Defendant Hill threatened Plaintiff Johnson with sanctions under CU's Protected Class Nondiscrimination Policy, telling Plaintiff Johnson that failure to attend would result in Plaintiff Johnson being formally charged with a violation of the Protected Class Nondiscrimination Policy with the potential for sanctions under Provision III(C)(1).[5]

---

[3] Ex. 2, Email Chain between S. Hill and Z. Johnson, copying D. Edwards, dated 11/4/24-11/5/24 (the "Hill Email").
[4] *Id.*, p.2.
[5] *Id.*, p. 1.

61.     Apparently, Ms. Hill meant to reference Provision II(C)1 of the Policy which reads: "**Failure to Comply with Orders or Sanctions:** Not complying with orders of the Equity Office or other appropriate university officials related to this Policy including, but not limited to, No-Contact Orders, Exclusion Orders, and Orders for Interim Suspension." Other potential sanctions can include the placement of a hold on a student's school account, preventing the student from registering for classes.

62.     Plaintiff Johnson agreed to meet with Defendant Hill to discuss the allegations that had been made against her. She only did so, however, because Defendant Hill threatened her with a sanction that would prevent her from registering for classes for the upcoming semester. Notably, Defendant Hill threatened to place a hold on her student account despite informing her that she had not violated any University policy.[6]

63.     On November 6, 2024, Plaintiff Johnson, along with her parents and legal counsel, met with Defendants Hill and Edwards over Zoom. During the meeting, Defendants Hill and Edwards told Plaintiff Johnson her comments, regardless of the harmless intent behind them, constituted harassment under the University's Nondiscrimination Policy. Though Defendants Hill and Edwards informed Plaintiff Johnson at this meeting that it would not be further investigating the allegations against her, Defendants Hill and Edwards repeatedly told Plaintiff Johnson that she needs to censor her own speech in the future to avoid future complaints with OIEC.

64.     For example, during the meeting, Defendant Edwards told Plaintiff Johnson that in order to avoid future Nondiscrimination Policy violations, she needed to "rethink" and "reconsider" the words that she said. Essentially, Plaintiff Johnson must conform her

---

[6] *See* Ex. 2, Hill Email Chain, p. 1.

speech based on the standards CU Boulder finds appropriate and not her own personal beliefs.

65.    Upon information and belief, Defendants Hill and Edwards reported all events in Plaintiff Johnson's case to Defendant Pomeroy as they were occurring, and Defendant Pomeroy was involved in Defendants Hill and Edwards' decisions on how to proceed against Plaintiff Johnson.

66.    Ultimately, Plaintiff Johnson was not punished beyond the mandatory "educational meeting" with OIEC, she now lives in constant fear that anything she says could be considered "unwelcome conduct" under the Policy which would lead to another complaint and potential investigation by OIEC. Plaintiff Johnson knows other students in a similar situation who keep their beliefs to themselves out of fear they will be investigated by OIEC for merely sharing their beliefs.

67.    At all relevant times, all the Defendants acted under the color of state law.

## <u>COUNT I: FIRST AMENDMENT RETALIATION</u>
(Against Defendants Pomeroy, Swanson, Hill, and Edwards)

68.    Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

69.    To establish a claim for First Amendment retaliation, a plaintiff must plead: "(1) that the 'plaintiff was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2010)

70.     Plaintiff Johnson engaged in constitutionally protected First Amendment activity when she asked questions during choir ensemble regarding the significance of a Pride celebration and an article of clothing another student was wearing.

71.     For engaging in the above-described protected activity, Defendant Swanson referred Plaintiff Johnson to the University's OIEC for punishment to prevent Plaintiff Johnson from engaging in similar activity in the future.

72.     Defendant Swanson referred Plaintiff Johnson to OIEC for punishment specifically because Plaintiff Johnson engaged in protected First Amendment speech that Swanson did not approve of.

73.     Defendant Swanson reporting Plaintiff Johnson to OIEC was a direct consequence of Plaintiff Johnson engaging in protected First Amendment activity and constitutes unlawful retaliation.

74.     Once reported to OIEC, Defendant Hill retaliated against Plaintiff Johnson by threatening her with charges under the Protected Class Nondiscrimination Policy when she implied that she would refuse to meet with OIEC.

75.     Plaintiff Johnson was engaging in First Amendment activity when she expressed her refusal to attend a meeting with OIEC.

76.     In response to Plaintiff Johnson engaging in protected activity (i.e., stating her intent to not meet with OIEC), Defendant Hill threatened to put an academic hold on Plaintiff Johnson's student account until she submitted and agreed to meet with OIEC.

77.     Defendant Hill specifically threatened to punish Plaintiff Johnson because she engaged in protected activity.

78.    When Plaintiff Johnson met with Defendants Hill and Edwards, the Defendants repeatedly admonished Plaintiff Johnson for engaging in protected First Amendment speech that OIEC did not approve of and warned Plaintiff Johnson that if she did not censor her own speech in the future, she would continue to have issues with OIEC.

79.    Defendant Pomeroy had knowledge of OIEC's investigation of Plaintiff Johnsons and, upon information and belief, was involved in Defendants Hill and Edwards' decisions on how to proceed against Plaintiff Johnson.

80.    Defendants Pomeroy, Swanson, Hill, and Edwards' retaliatory actions against Plaintiff Johnson have caused her to suffer damages.

81.    Plaintiff Johnson prays that this Court enter a judgment awarding her monetary damages for the retaliation she suffered at the hands of these Defendants.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT
**(Nondiscrimination Policy)**
**(Against Defendant University of Colorado & Schwartz)**

82.    Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

83.    A bedrock principle of the First Amendment is that any policy or law attempting to control speech must be sufficiently tailored to exclusively abridge unprotected speech. Any policy which fails to distinguish between protected and unprotected speech violates the First Amendment and must be struck down.

84.    Here, the Policy violates the First Amendment. By its plain terms, the Policy applies to protected speech; it is unconstitutionally overbroad. Virtually any opinion or belief, regardless of the speaker's intent, could be classified as "unwelcome" and constitute harassment or discrimination under the Policy.

85.    By attempting to limit "unwelcome" speech relating to an individual's race, ethnicity, gender, sexual orientation, etc., the University has created a policy that constitutes an impermissible restraint based on the content and viewpoint of the subject speech.

86.    The University has no compelling interest in curtailing such speech. Even if it did, such interest is not narrowly tailored to the type of speech it seeks to restrict.

87.    The Policy punishes students for engaging in protected speech with the threat of forced participation in educational courses, removal from campus life, suspension, or expulsion. The mere possibility and threat of punishment for expressing an opinion, unpopular or not, or satire only serves to chill protected speech by deterring students from speaking their minds on relevant topics and thus limiting students' educational freedom.

88.    Equally egregious, the University selectively enforces its Nondiscrimination Policy against students who hold and express conservative viewpoints.

89.    Plaintiff Johnson was referred to the OIEC for violating the Policy after engaging in protected speech by asking a clarifying question about Pride Day at choir rehearsal and asking about an article of clothing a student wore to class.

90.    Relying on Provision II(C)1 of the Policy, the OIEC investigator threatened Plaintiff Johnson with sanctions in order to compel her attendance at a meeting with OIEC.

91.    Due to the disparate treatment Plaintiff Johnson received by Defendant Swan and OIEC, Plaintiff Johnson is now concerned that she could be punished for simply expressing her opinion or inquiring about "controversial" topics and is less likely to speak on matters of public concern out of fear of further punishment.

92.     The University's policy and Defendant Schwartz's enforcement of the policy violates the First Amendment.

93.     Plaintiff Johnson prays that this Court enter judgment declaring the Nondiscrimination Policy as violative of the First Amendment of the United States Constitution and enter an injunction permanently enjoying the University and Defendant Schwartz from enforcing the Nondiscrimination Policy.

## COUNT III: VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: VOID FOR VAGUENESS
### (Nondiscrimination Policy)
### (Against Defendant University of Colorado & Schwartz)

94.     Plaintiff Johnson realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

95.     Any law which restricts the First Amendment must clearly define its prohibitions and clearly establish which conduct is and is not prohibited.

96.     A law can be found to be void for vagueness when either: (1) "'fails to provide ordinary people of intelligence a reasonable opportunity to understand what conduct it prohibits'" and (2) "'if it authorizes or encourages arbitrary and discriminatory enforcement.'" *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012)).

97.     By failing to define "unwelcome conduct," the University has failed to put students on notice of the specific speech that could constitute a violation of the

University's Nondiscrimination Policy. The Policy is unconstitutionally vague and therefore unconstitutional.

98.    As written, the Policy fails to put students and employees on notice that their speech could be considered "unwelcome conduct" and violate the Policy.

99.    Further, the Policy allows for inconsistent application as there is no definition OIEC investigators can consistently apply to reports to determine whether a respondent's actions constituted "unwelcome conduct" or created a hostile environment for the complainant. Under the current version of the Policy, two different investigators could potentially come to different conclusions on whether certain conduct violates the Policy.

100.    Plaintiff Johnson prays that this Court enters a judgment declaring the Nondiscrimination Policy void for vagueness and enter an injunction permanently enjoying the University of Colorado and Defendant Schwartz from enforcing its Nondiscrimination Policy.

## JURY TRIAL DEMAND

101.    Plaintiff Johnson demands a jury trial on all counts so triable.

## PRAYER FOR RELIEF

Plaintiff Johnson prays this Court enters judgment in her favor and awards the following relief:

i.    A declaratory judgment against CU that the University's Anti-Discrimination Policy violates the First and Fourteenth Amendments to the U.S. Constitution;

ii.    A permanent injunction barring the University and Schwarz from enforcing the Nondiscrimination Policy;

iii.     A preliminary injunction granting the relief specified above during the pendency of this action;

iv.     Monetary damages against the individual Defendants;

v.     Attorney's fees and pursuant to 42 U.S.C. § 1988, and all other applicable law; and

vi.     Any further relief this Court deems necessary and appropriate.

Respectfully submitted,

*/s/ Geoffrey N. Blue*
Geoffrey N. Blue
Colorado Bar No. 32684
Scott E. Gessler
Colorado Bar No. 28944
**Gessler Blue, LLC**
Attorneys for Plaintiff
7350 E. Progress Pl., Suite 100
Greenwood Village, Colorado 80111
720.647.5320
gblue@gesslerblue.com
sgessler@gesslerblue.com

Matthew Seth Sarelson
Florida Bar 888281
**DHILLON LAW GROUP, INC.**
Attorneys for Plaintiff
1601 Forum Place, Suite 403
West Palm Beach, Florida 33401
305.773.1952
msarelson@dhillonlaw.com

/s/ John-Paul S. Deol
John-Paul S. Deol
California Bar 284893
**DHILLON LAW GROUP, INC.**

Attorneys for Plaintiff
177 Post Street, Suite 700
San Francisco, California 94108
415.741.7935
jpdeol@dhillonlaw.com

Madison Hahn, Esq.
**Young America's Foundation**
11480 Commerce Park Dr., Suite 600
Reston, Virginia 20191
mhahn@yaf.org
800.872.1776

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of May 2025, the foregoing Proposed Scheduling Order was electronically served via CM/ECF on all parties who have entered an appearance in this matter via their counsel of record.

_/s Joanna Bila_____
Joanna Bila, Paralegal