**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF COLORADO**
Case No.: 1:25-cv-00390-GPG-NRN

**ZOE JOHNSON**

Plaintiff,

v.

**JUSTIN SCHWARTZ, in his official capacity as Chancellor of the University of Colorado, Boulder,**
**ELIZABETH K. SWANSON,**
**SEQUOIA K. HILL,**
**DANIE EDWARDS,**

Defendants.

---

# SECOND AMENDED COMPLAINT

---

Plaintiff Zoe Johnson hereby brings this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION & VENUE

1. This action arises under the First and Fourteenth Amendments to the United States Constitution and is actionable pursuant to 42 U.S.C. §§ 1983 and 1988. It is actionable against Chancellor Schwartz, in his official capacity, pursuant to *Ex Parte Young*.

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

3. This Court is an appropriate venue pursuant 28 U.S.C. § 1391 because all Defendants reside here and a substantial portion of the events or omissions giving rise to Plaintiff Johnson's claims occurred here.

## COLOR OF STATE LAW

4. All Defendants were, and are, acting under the color of state law and authority at all material times.

## PARTIES

5. Plaintiff Johnson is a citizen and resident of Boulder, Colorado. She is currently a student at the University of Colorado Boulder. She seeks injunctive relief against Schwartz, in his official capacity, on her own behalf and also on behalf of all other CU Boulder current and future students.

6. Defendant Justin Schwartz is the Chancellor of the University of Colorado, Boulder (the "University"). Defendant Schwartz is the "top academic leader of the University," "provides oversight of all academic, fiscal, and administrative duties." Defendant Schwartz is sued in his official capacity and only for injunctive relief. Schwartz is ultimately responsible for the OEIC and enforcement of APS 5065, the offending school policy.

7. Defendant Elizabeth K. Swanson is the Associate Director of Choral Activities at the University of Colorado Boulder. Defendant Swanson, under OIEC's Policies and Procedures, is considered a "responsible employee" required under OIEC's policies to report any potential violation of the University's Nondiscrimination Policy (APS 5065). Defendant Swanson is sued in her individual capacity.

8. Defendant Sequoia K. Hill is an Investigator and Case Resolution Specialist for CU Boulder's OIEC. As part of her duties, Defendant Hill investigates potential violations of OIEC's policies, including OIEC's Nondiscrimination Policy. Defendant Hill is sued in her individual capacity.

9. Defendant Danie Edwards is a Senior Investigator and Case Resolutions Specialist for CU Boulder's OIEC. As part of her duties, Defendant Hill investigates potential violations of OIEC's policies, including OIEC's Nondiscrimination Policy. Edwards was, upon information and belief, Defendant Hill's supervisor or at least her senior. Defendant Edwards is sued in her individual capacity.

## BACKGROUND

10. Colleges and universities were once known as places where open—and often uncomfortable—conversations could be had at a high level. Students and professors alike could engage in the "marketplace of ideas" to attain a better understanding of difficult and complex social issues without sacrificing educational freedoms.

11. Unfortunately, to the detriment of the commonly held belief that speech and debate "on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), public universities across America have begun to actively police and censor certain types of speech that the university itself deems unsavory or offensive.

12. Much of this censorship arises from the implementation of bias response teams and other university policies which prohibit certain types of "unwelcome" speech, sometimes referred to as campus speech codes.

13. Speech codes, known for using wide-sweeping, overly broad language that attacks both protected and unprotected speech, chill speech on university campuses through the imposition of content-based restrictions that come with harsh punishments. Indeed, mere invitations to meet with a university's faculty concerning a potential breach of a speech code chills student speech because the invitations carry "an implicit threat of consequence should a student decline the invitation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

14. Federal courts have not hesitated to strike down similar campus speech policies on constitutional grounds. *See, e.g., Speech First, Inc. v. Fenves*, 979 F.3d 319, 338–339 n.17 (5th Cir. 2020) (collecting cases where federal courts "have uniformly found campus speech codes unconstitutionally overbroad or vague").

15. Recognizing the futility and problems associated with having policies which police student speech, some state universities have begun to eliminate their speech codes and bias response teams due to their impact on First Amendment expression. Notably, in 2016, University of Northern Colorado put an end to their Bias Response Team program because the program "made people feel that we were telling them what they should and shouldn't say." The University of Northern Colorado made the decision to shut down its bias response teams because it could not enforce its policies "at the expense of free speech and academic freedom."

16. Other public universities have had to alter their policies after successful court challenges to their bias response team and speech code policies. *See, e.g., Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) (University of Michigan amended policy after Speech First, Inc. filed lawsuit against university); *Fenves*, 979 F.3d at 327

(University of Texas at Austin amended policy after Speech First, Inc. filed lawsuit against university).

17. The chilling impacts of speech codes and bias response teams is not limited to student speech. In 2013, CU Boulder, through its Title IX Office, pressured one of its professors to resign when Title IX administrators sat in to audit her class after receiving complaints from students regarding the content of the course.[1]

18. Here, through its OIEC and APS 5065, the University has created a hostile environment which discourages and punishes conservative students and faculty for voicing an opinion that is considered disfavored and unpopular to the campus community at large.

19. Make no mistake, APS 5065 is an unconstitutional campus speech code.

20. The University's hostility towards conservative students is not surprising. According to publicly available political donation information, the University's faculty overwhelmingly leans left, as approximately 94% of University professors who donate politically, donate exclusively to Democrat candidates and causes.

**THE OIEC**

21. In August 2014, CU Boulder created the OIEC "to integrate resolutions of all complaints against protected-class harassment and discrimination or sexual misconduct – whether against a student, employee, or affiliate – into one office."

22. The OIEC purportedly "plays a crucial role in creating a safe, more inclusive campus by driving awareness, education and support for students, faculty and staff and

---

[1] Scott Jaschik, *Too Risky for Boulder?*, Inside Higher Ed (Dec. 15, 2013), http://www.insidehighered.com/news/2013/12/16/tenured-professor-boulder-says-she-being-forced-out-over-lecture-prostitution.

responding to behaviors prohibited by university policy." The goal of the office is to provide students with "a greater sense of inclusion, support and belonging" and attempts to accomplish this goal by "creat[ing] and foster[ing] a safe, inclusive, and accessible environment." In practice, it does the opposite.

23. According to the OIEC's Resolution Procedures, OIEC is the administrative body charged with implementing and enforcing various university policies, including the University's Protected Class Nondiscrimination Policy (APS 5065).

24. Complaints of violations of any policy under the purview of OIEC can be made by emailing OIEC directly, calling OIEC, or by completing the online form available through OIEC's website.

25. Students and select faculty are encouraged to file a complaint with OIEC if they have knowledge of any conduct prohibited by the policies which OIEC maintains authority over.

26. Once a report is filed with OIEC, it has the discretion to conduct a preliminary investigation into the allegations of the report, which consists of a determination of the report implicates a policy within the purview of OIEC's jurisdiction.

27. After OIEC conducts its preliminary investigation, OIEC's investigation will proceed to the one of the following phases: (1) formal grievance process, (2) policy compliance remedies, (3) adaptable resolutions, and (4) referrals and other remedies.

28. All of OIEC's investigations are handled by "trained officials" who allegedly "do not have a conflict of interest or bias for or against the complainant or respondent, or against complainants or respondents generally."

29. OIEC, and its investigators, attempt to address "allegations with respondents through education resolutions that promote an inclusive culture at the university, including being respectful of differences and identifying strategies to manage conflict that cultivate a safe, inclusive, and accessible campus environment for all members of the CU Boulder community."

30. Regardless of what investigation method is ultimately used by OIEC, if a policy violation is found, OIEC will issue some form of "punishment" on the offending party, such as written reprimands, forced attendance of educational courses, suspension, disciplinary probation, and educational programming or training as necessary.

31. Recently, OIEC has come under scrutiny for its complete failure to address and resolve complaints of discrimination, harassment, and inequity that are prevalent on the University's campus.[2]

32. The OIEC targets and investigates students who express conservative views or hold opinions that are otherwise considered "unpopular" on campus instead of resolving real issues of discrimination, harassment, and inequity. The policy serves as an unlawful speech code.

33. It appears the University or CU Boulder have no intention of resolving any genuine discrimination issues, as the University's Strategic Plan for 2021-2026, emphasizes that the University will focus on DEI initiatives rather than other initiatives that benefit the university as a whole.

---

[2] Hillary Potter, *CU Boulder has Failed for Years to Address, Discrimination, Harassment, Inequity and Retaliation*, The Denver Post: Opinion (Sept. 19, 2024), http://www.denverpost.com/2024/09/19/cu-harassment-discrimination-complaints-leadership-failed-investigate/.

## THE UNIVERSITY'S NONDISCRIMINATION POLICY

34. On September 8, 2023, the University of Colorado adopted Regents Policy 9.A "Diversity, Equity, and Inclusion" (then called Policy 10.A). *See* Exh. A (Regents Policy 9.A). The purpose of Policy 9.A is to promote "diversity in the university community and insist[] that no individual or group shall be marginalized or systematically excluded." *Id.* Policy 9.A specifically highlights that CU values and strives to "protect robust and respectful debate, champion academic freedom, and treat each other with fairness." *Id.*

35. In accordance with the "vision" of Regents Policy 9.A, the University adopted its Protected Class Nondiscrimination Policy (APS 5065) (the "Policy"), which "prohibits discrimination and harassment on the basis of race, color national origin, sex age disability, creed, religion, veteran status, marital status, political affiliation, political philosophy, pregnancy or related conditions, sexual orientation, gender identity and gender expression[.]" *See* Exh. B (APS 5065). The purpose of the policy is "to ensure equal access to the academic and professional experiences at the university[.]" *Id.*

36. APS 5065 is a systemwide policy, but campuses enforce them independently.

37. The Policy creates what are known as "Mandatory Reporters." A Mandatory Reporter *must* report to OIEC any violations of the Policy. University professors and administrators are all Mandatory Reporters under the Policy. Mandatory Reporters, however, have unlimited discretion to decide what is or is not a violation APS 5065. *I.e.*, what triggers a Mandatory Reporter's obligation under the Policy is left to the Mandatory Reporter. Mandatory Reporters are given no training – and certainly no training on free speech – on how to enforce the policy.

38. The Policy is enforced by OIEC through its investigators, such as Defendants Edwards and Hill. Despite being Vice Chancellor of the OIEC, Vice Chancellor Pomeroy has little to no involvement with the day-to-day operations of the OIEC, including its investigations. In fact, Vice Chancellor Pomeroy testified during her deposition: "it is not my job to determine how cases are resolved specifically under the [P]olicy." At best, Vice Chancellor Pomeroy has a general understanding of the OIEC's operations through monthly meetings with OIEC staff. But even then, these meetings do not go into specifics regarding the operation of OIEC and the cases OIEC investigators are actively working on.

39. Rather, OIEC's investigators, like Defendants Edwards and Hill, handle the day-to-day operations and are responsible for investigating the complaints that are filed with OIEC and enforcing the Policy.

40. As part of their job requirements, OIEC investigators are required to have knowledge of protected classes, federal Civil Rights laws, and the First Amendment of the United States Constitution, and experience in identifying discrimination and harassment. *See* Exh. C (OIEC training materials). Notably, the training materials provided to OIEC contain incorrect information. *Id.*

41. For example, the only training materials produced by the University as part of this litigation, prepared by the Husch Blackwell law firm, incorrectly state that there is "[n]o general protection for offensive, inappropriate, nasty, etc. 'hate speech.'" *Id*. Obviously, there is no First Amendment precedent which supports the conclusion that "offensive," "inappropriate," "nasty," or "hate speech" are not protected by the First

Amendment. Vice Chancellor Pomeroy correctly testified that the training material was wrong and that offensive or nasty "hate speech" is in indeed constitutionally protected.

42. This cannot be overstated – the only training materials provided to OIEC investigators and produced in this lawsuit are completely wrong and CU's staff is being trained that the First Amendment does not protect offensive, inappropriate or other so-called hate speech.

43. As part of their job duties, OIEC investigators are tasked with investigating claims of discrimination and sexual misconduct. With regards to claims of discrimination, Section II of the Policy prohibits "discrimination and harassment based on protected class."

44. For purposes of the Policy, protected classes means "race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, marital status, political affiliation, and political philosophy." The Policy then provides separate definitions for each of the seventeen classes the Policy identifies as protected. For example, "sexual orientation" is defined as "an individual's physical, romantic, and/or emotional attraction toward people. Examples include, but are not limited to: heterosexual, bisexual, gay, lesbian, pansexual, asexual, queer, demisexual, or questioning."

45. APS 5065 is unconstitutionally vague for several reasons.

46. The "hostile environment" standard and its single-incident exception is vague. The policy defines harassment as conduct that "unreasonably interferes with an individual's work or academic performance or creates an intimidating or hostile work or educational environment." While the "severe, persistent, or pervasive" language broadly

tracks established case law, the policy then states that "a single or isolated incident of conduct based on protected class may be sufficient." This creates tension — the well-understood legal standard is built around patterns of conduct, and allowing a single incident to qualify substantially widens the zone of uncertainty about what speech or conduct could trigger a violation. A reasonable person would struggle to know in advance whether a single remark crosses the line.

47. The breadth of "creed" and "political philosophy" is unlimited and vague. The definition of creed covers "sincerely-held moral and ethical beliefs as to what is right and wrong, and/or addresses ultimate ideas or questions regarding the meaning of existence." Political philosophy means "a person's belief or endorsement of any system of thought pertaining to public policy or the administration of governmental functions." At a university — where debating moral questions, public policy, and the meaning of existence is the core mission — these definitions are extraordinarily broad. Nearly any substantive intellectual disagreement could be characterized as unwelcome conduct directed at someone's creed or political philosophy. The policy does not give clear guidance on where vigorous academic debate ends and harassment based on these protected classes begins.

48. The "unreasonably interferes" standard is vague and subjective. This is doing a lot of work in the policy without much elaboration. Whether conduct "unreasonably" interferes with someone's academic performance is inherently subjective. The "reasonable person" qualifier helps somewhat, but combined with the expansive protected classes, it leaves considerable ambiguity. A student who feels that a professor's persistent critique of their political philosophy "unreasonably interferes" with their

academic performance has a textual basis to file a complaint, even if most would consider that normal pedagogy.

49. The speech carve-out is itself vague. The policy states it "is intended to protect members of the campus community from prohibited conduct, not to regulate protected speech," and says it will not prohibit conduct "legitimately related to course content, teaching methods, research, or scholarship." But "legitimately related" is undefined. Who decides legitimacy? This safe harbor is supposed to resolve the tension between the policy and the First Amendment, but it introduces its own layer of ambiguity — and potentially chills speech by placing the burden on speakers to guess whether their expression will be deemed "legitimate."

50. "Other steps" beyond discipline permits unlimited retaliation. The policy says that while the university "may not discipline speakers for protected speech, the university retains an obligation to take other steps as necessary" to eliminate a hostile environment. What these non-disciplinary "other steps" might be is left entirely unspecified, which raises concerns about arbitrary enforcement through informal means that may themselves burden speech.

51. The "unwelcome" trigger is vague and undefined. Prohibited harassment begins with "unwelcome verbal, written, or physical conduct based on one's protected class." Since unwelcomeness is determined from the recipient's perspective, and the protected classes include political philosophy and creed, a speaker has no reliable way to predict whether their expression of ideas will be deemed "unwelcome" by a listener who holds the ideas being critiqued as part of their protected identity.

52. Defendants Edwards and Hill testified that there is nothing in the Policy which assists investigators with determining whether a student's conduct qualified as "unwelcome." It is solely within the assigned investigator's discretion to determine whether conduct qualifies as "unwelcome."

53. Similarly, Defendants Edwards and Hill testified there is nothing in the Policy which assists investigators with determining whether conduct "unreasonably interferes" with another student's academic performance. Again, it is solely within the assigned investigator's discretion to determine if conduct unreasonably interfered with another student's academic performance.

54. Finally, Defendants Edwards and Hill testified that there is nothing in the Policy which offers guidance on how to determine whether a student's conduct created an "intimidating educational environment." It is within the assigned investigator's discretion to make such determination without the use of any sort of guiding factors or examples.

55. The Policy's failure to include essential definitions for these key terms leads to inconsistent and arbitrary enforcement of the Policy. A determination as to what is considered "unwelcome conduct," or if conduct creates an intimidating educational environment will differ between OIEC investigators and thus lead to inconsistent application of the Policy.

56. Under the Policy both students and faculty can report allegations of prohibited conduct to OIEC. Reporting can be accomplished by directly contacting OIEC via email and phone or by completing an online form available through OIEC's website.

57. Once a complaint has been filed, OIEC will assume jurisdiction and begin its investigation.

58. After a complaint has been filed, an “intake specialist” (a position entirely distinct from OIEC investigator) will review the complaint, determine if the Policy is implicated, and, if the Policy is implicated, assign it to an OIEC investigator. Importantly, upon receiving a complaint, the intake specialist has discretion to conduct her own First Amendment analysis and make her own determination as to whether the Policy is implicated by the complaint. Although Vice Chancellor Pomeroy testified that these decisions should not be made by an intake specialist (as opposed to an OIEC investigator), the documents provided by CU in this matter unequivocally indicate that these intake specialists are indeed conducting an initial free speech analysis.

59. The intake specialists have no training with regard to federal law, including the First Amendment. No one knows what factors, if any, the intake specialist uses when determining if the First Amendment is implicated when evaluating a complaint.

60. Apparently, if the intake specialist decides that the complaint implicates the Policy, she will assign the complaint to an OIEC investigator. Once an investigator is assigned, she also may conduct a First Amendment analysis. OIEC investigators have the discretion to determine if a student’s conduct is protected by the First Amendment and decline to investigate for that reason. Again, the discretion given to OIEC investigators creates issues. For example, Defendant Hill testified that she has never made a determination that a complaint implicated First Amendment protections and declined to investigate on those grounds. But OIEC complaints produced by the

University show that other investigators declined to investigate a complaint based on First Amendment considerations.

61. Prior to any formal investigation, OIEC maintains authority to issue either supportive or safety measures as a temporary solution for any reports of violations regarding the Policy.

62. Supportive measures are "non-disciplinary, non-punitive individualized services . . . designed to restore or preserve equal access to the university's education program or activity without unreasonably burdening the other party[.]" But safety measures include varying degrees of punishment including, but not limited to suspension of the respondent, and exclusion from campus, residence halls, and classes.

63. The Policy mandates that certain faculty members, referred to as "responsible employees," "who witness[] or receive[] a written or oral report alleging that a member of the university community has been subjected to or has committed an act of prohibited conduct must promptly report the allegations to the Equity Office."

64. Notably, if the complaining student or professor decides not to pursue the complaint with OIEC after filing, OIEC will "weigh that request against the university's obligation to provide a safe, non-discriminatory environment," and potentially overrule the complainant's request. It appears that OIEC has never overrode a person's request to discontinue a complaint.

65. Once OIEC has received the complaint, it will conduct a preliminary inquiry to determine whether the Policy has been violated and whether the complaint and parties fall within the jurisdiction of OIEC. A preliminary inquiry can include a meeting with the complainant and respondent to gather additional information.

66. If OIEC determines sufficient evidence exists that a violation of the Policy occurred, it may proceed to the formal grievance procedure where the student will be notified in writing of the allegations against her and participate in the process of collecting evidence through review of applicable school records and interviews with the parties and witnesses, if any.

67. If the OIEC investigator determines the student did violate the Policy, the matter will be referred to the sanctioning board to determine punishment. Sanctions for violation of the Policy include: written reprimand, educational sanctions (forced attendance of training program regarding protected-class harassment), meeting with Senior Director of Support and Safety Measures, Residence Hall Reassignment, Residence Hall Termination, Formal Disciplinary Probation, Restriction or Denial of University Services, suspension, expulsion, and disciplinary hold on the respondent's student record and account.

68. One resolution tool available to OIEC investigators is to compel a "Policy Compliance Meeting" (PCM) between the assigned OIEC investigator and the Respondent. The purpose of a PCM is to force the Respondent to reevaluate her speech or conduct and ensure that it complies with the Policy. The decision to host and compel attendance are entirely within the discretion of the investigator assigned to the case. These PCMs are just mandatory re-education sessions but CU uses the more innoxious phrase Policy Compliance Meeting.

69. CU had authority to make a PCM mandatory. The PCM that Zoe Johnson was forced to endure was mandatory under threat of administrative suspension.

70. After the filing of this lawsuit, OIEC changed its policy and apparently no longer makes PCMs mandatory. PCMs may no longer be mandatory, but even so-called voluntary attendance at a PCM can be a coercive tool used by OIEC.

71. The OIEC targets and investigates students who express conservative views or hold opinions that are otherwise considered "unpopular" on campus and either charges them with violations of the Policy or forces them to attend PCMs in order to compel a change in behavior to something more acceptable by the University. The PCM is one weapon CU uses to enforce its unconstitutional speech code.

**ZOE JOHNSON'S EXPERIENCE WITH PROF. SWANSON**

72. Plaintiff Johnson is a fourth-year undergraduate student at CU Boulder and is a member of the choir ensemble.

73. Plaintiff Johnson considered herself to be conservative, both politically and religiously, and holds opinions and beliefs that are considered unpopular, or in the minority, on campus.

74. Since Freshman year, Zoe has participated in the choir ensemble which Defendant Swanson leads.

75. Plaintiff Johnson enjoys choir ensemble, but sometimes disagrees with the direction Defendant Swanson leads the ensemble.

76. For example, on or about September 9, 2022, during choir practice, Plaintiff Johnson was talking with a fellow choir member in class when Plaintiff Johnson said something akin to: "I don't care about your identity, I care more about what you have to say as a person, more than how you look." A choir member overheard Plaintiff Johnson's statement and privately complained to Defendant Swanson that Plaintiff Johnson had

made a discriminatory comment regarding people of color. That choir member did not confront Johnson personally and remains unidentified.

77. In response, on September 15, 2022, Defendant Swanson sent three separate—but identical—emails to three different students, asking them if Plaintiff Johnson's comment struck them "negatively in any way." *See* Exh. D. Defendant Swanson then described Plaintiff Johnson's comment as "ignorant and insensitive" because Plaintiff was part of the "majority" and "do[es] not recognize the inherent privilege that comes with being part of the majority." These emails were unsolicited and not organic. Swanson was stirring up animosity against Johnson. Swanson's conduct was targeted at Johnson because of her political views.

78. On September 16, 2022, Defendant Swanson met with Plaintiff Johnson regarding the statement and, over the course of twenty minutes, proceeded to shame Plaintiff Johnson for her comment and her "white privilege," stating that Plaintiff Johnson could never understand the struggles people of color face.

79. In Swanson's profoundly left-leaning and illiberal world view, a white person who rejects racism and views individuals as individuals is herself racist and that person deserves to be ostracized and targeted.

80. Fast forward two years to the second course Johnson took with Swanson. In October 2024, during choir rehearsal, Plaintiff Johnson had an encounter with another member of the choir ensemble. The ensemble's lesson that day involved a discussion on LGBTQ Pride and the history of Pride. Professor Swanson encouraged the discussion even though it was not part of the approved curriculum. During a discussion with other members of the ensemble, Plaintiff Johnson, seeking to inquire more information about

the day's lesson, asked something along the lines of: "Why do we need two months of this? Didn't we do this back in June?"[3] Apparently, unidentified students of the ensemble took offense to Plaintiff Johnson's question and secretly reported her to Defendant Swanson. Importantly, Defendant Swanson was completely unaware of Plaintiff Johnson's question, as she did not hear it. Nor did anyone answer her question.

81. Emails produced by the University show that Swanson reached out to students in the choir ensemble and "encouraged" them to file reports against Plaintiff Johnson. (Swanson lied under oath when she testified that she did not encourage them to file reports). On October 23, 2024, Defendant Swanson emailed Defendant Edwards that she encouraged any student who was offended by Zoe's homophobic comment to file a report with the OIEC. After her false testimony was thoroughly undermined by the emails, Defendant Swanson later confirmed during her deposition that she encouraged a total of three students to file reports against Plaintiff Johnson.

82. Defendant Swanson testified that she did not know the substance of Plaintiff Johnson's "homophobic" comment. She blindly encouraged students to report Plaintiff Johnson without learning Johnson's words and with a complete disregard for her First Amendment rights. She never knew what Johnson actually said and she never cared to find out – it was sufficient that other students referred to these unidentified remarks as homophobic. Swanson was never interested in the truth, she was only interested in targeting Zoe Johnson because of her views.

83. In or around October 25, 2024, during a guest speaker presentation about race, Plaintiff Johnson and another student began discussing the concept of "reverse

---

[3] June is "Pride Month" while October is "LGBTQ+ History Month."

racism." According to the student, Johnson was "very condescending and invalidating" regarding the subject.

84. After class, the student reported her conversation to Swanson. Importantly, the student did not disclose the context of the conversation and merely informed Swanson that Johnson had made a comment about "reverse racism." Once again Swanson was entirely uninterested in what Johnson may have actually said; this was another opportunity for Swanson to target Johnson because of her beliefs.

85. On November 1, 2024, Swanson sent a follow up email to the student. In the email, Swanson "strongly recommend[ed]" that the student file a report with the OIEC against Johnson for her comment about "reverse racism." Swanson further labeled Johnson's behavior as "increasingly problematic." Notably, Swanson labeled Johnson's behavior as "problematic" and encouraged this student to file an OIEC complaint despite not knowing the actual substance of Johnson's comment. At the time of the email, Swanson had no way of knowing if Zoe's comment actually implicated the Policy. *See* Exh. E.

86. Equally egregious, Swanson coached the student by telling her to write in her report that Zoe's "comments were made to you directly and were offensive in nature." Swanson was motivated by her desire to punish Zoe for her speech because she stated: "The goal is for Zoe to get the message from multiple angles that her behavior is not acceptable and affects others."

87. Again, Swanson did all of this without knowing the substance of Johnson's comment.

88. When confronted with this email during her deposition, Swanson—under oath—denied that she recommended the student to file a report against Johnson despite her email explicitly stating that she "strongly recommend" that the student file a complaint against Johnson. Unlike Swanson's deposition testimony, the documents do not lie.

89. Swanson then attempted to justify her actions by claiming that she did not want to be in the middle of the student's complaint and OIEC, and was merely providing the student with the "option" of filing an OIEC complaint. Of course, her testimony directly conflicts with the explicit text of the email where Defendant Swanson inserts herself by encouraging the student to file a complaint with OIEC.

90. The student responded to the email confirming that she filed a report against Johnson like Swanson encouraged her to do.

91. Following the advice of her colleague, Swanson filed her own complaint with OIEC against Johnson regarding the reverse racism comment. Again, Swanson did so without knowing the substance of the "reverse racism" comment.

92. Swanson testified that prior to encouraging students to file reports against Zoe that she did not actually review the Policy to see if Johnson's speech fell within the scope of the Policy. Swanson further testified that she did not consider Johnson's right to free speech prior to filing her own report and encouraging other students to do so. According to her, she was just doing what the Policy required her to do as a mandatory reporter.

93. Later, on a separate date, a male student wore a pink wave cap (also known as a do-rag) to choir ensemble practice. Zoe, having never seen a wave cap before, turned to one of her classmates and asked her what the male student was wearing. The

classmate found Zoe's question to be offensive and reported her comment to Swanson, who later reported the comment to the OIEC. To this day, the person wearing the wave cap has no idea that Johnson asked a friend about the cap he was wearing.

94. On October 30, 2024, Johnson received an email from Swanson, asking if Johnson had time to speak with her one on one regarding a "few concerns." Swanson's email did not explain any further as to what the concerns were. Johnson, confused by Swanson's email, asked if Swanson could provide further information on the concerns she mentioned. *See* Exh. F.

95. Swanson explained that "some fellow choir members brought concerns" to her that she wanted to discuss privately with Plaintiff Johnson. Once again, Swanson shared neither the content nor details about the complaint against Johnson. Believing she done nothing wrong, Johnson politely and respectfully declined to meet with Swanson, stating "I truly never meant to hurt anyone but I believe that students should have the emotional maturity to resolve any issues they have with me on their own." In a series of increasingly harassing emails, Swanson continued to pressure Johnson into meeting with her. After Johnson repeatedly declined, Swanson informed Johnson that she reported her to OIEC and threatened to remove her from the choral ensemble if her behavior continued. *Id.*

96. All of Johnson's speech was constitutionally protected. Only three categories of speech can subject a student to discipline – obscenity, targeted speech designed to or likely to create physical violence (*i.e.*, true threats, incitement, and fighting words), or disruptive speech that interferes with the education process. None of

Johnson's speech implicated any of these exceptions. Even Professor Swanson testified Johnson's speech was not disruptive.

## PLAINTIFF JOHNSON'S EXPERIENCE WITH OIEC

97. On November 4, 2024, Johnson received an email from Hill seeking to schedule a time to discuss "concerns reported into [OIEC] involving comments [Zoe] made to other students relating to protected class identities." In response, Johnson declined to meet with OIEC and asked if there would be any consequences if she chose not to attend the meeting. *See* Exh. G.

98. Hill then told Johnson attendance was required according to CU's Protected Class Nondiscrimination Policy and that failure to attend would result in Johnson being formally charged with a violation of the Protected Class Nondiscrimination Policy with the potential for sanctions under Provision III(C)(1) of the Policy.

99. Provision II(C)1. of the Policy reads: "**Failure to Comply with Orders or Sanctions:** Not complying with orders of the Equity Office or other appropriate university officials related to this Policy including, but not limited to, No-Contact Orders, Exclusion Orders, and Orders for Interim Suspension." Other potential sanctions can include the placement of a hold on a student's school account, preventing the student from registering for classes.

100. Johnson agreed to meet with Hill to discuss the allegations that had been made against her. She only did so, however, because Defendant Hill threatened her with a sanction that would prevent her from registering for classes for the upcoming semester. Notably, Hill threatened to place a hold on her student account despite informing her that she had not violated any University policy.

101. Prior to their PCM with Johnson, Defendants Hill and Edwards prepared an outline of conversation topics. *See* Exh. H (Johnson PCM Outline). The outline included conversation points on how asking a question about Pride History Month is minimizing towards people who identify as LGBTQ+ and an explanation on the history of durags and their use in Black culture. *Id.* In other words, Hill and Edwards drafted a re-education memo to discuss with Johnson.

102. On November 6, 2024, Johnson, along with her parents and legal counsel, met with Defendants Hill and Edwards over Zoom. During the meeting, the Hill and Edwards told Johnson her comments, regardless of the harmless intent behind them, constituted harassment under the University's Nondiscrimination Policy. Though Hill and Edwards informed Johnson at this meeting that it would not be further investigating the allegations against her, Hill and Edwards repeatedly told Johnson that she needs to censor her own speech in the future to avoid future complaints with OIEC.

103. For example, during the meeting, Edwards told Johnson that in order to avoid future Nondiscrimination Policy violations, she needed to "rethink" and "reconsider" the words that she said. Essentially, Johnson must conform her speech based on the standards CU Boulder finds appropriate and not her own personal beliefs.

104. Ultimately, Johnson was not punished beyond the PCM with OIEC, but she now lives in constant fear that anything she says could be considered "unwelcome conduct" under the Policy which would lead to another complaint and potential investigation by OIEC. Johnson knows other students in a similar situation who keep their beliefs to themselves out of fear they will be investigated by OIEC for merely sharing their beliefs.

105. The process is the punishment. Forcing Johnson to sit for a re-education session and threatening her with an administrative suspension is an adverse action. Zoe was, in fact, for a time, locked out of CU's registration system. But for her conservative beliefs, none of this would have happened to her.

106. But there's more. The evidence is now overwhelming that Professor Swanson violated APS 5065 when she systematically targeted Zoe Johnson for her conservative beliefs. Due to her beliefs, she stirred up animosity against Johnson among her classmates. Swanson even lied about her involvement and her actions during her deposition in a transparent but futile effort to avoid responsibility. CU confirmed that there is no time limit for making complaints or investigating violations of the Policy. CU has never investigated Swanson for violating APS 5065 even though it could and it should. A conservative student who did not violate APS 5065 was punished, while a liberal professor who blatantly violated APS 5065 faced no repercussions.

**COUNT I: 42 U.S.C. § 1983 (*Ex Parte Young*)**
**(Against Defendant Schwartz)**

107. Plaintiff Johnson realleges and incorporates by reference paragraphs 1-106 as though fully set forth herein.

108. CU Boulder is immune from damages under 42 U.S.C. § 1983. The head of CU Boulder, however, can be sued in his official capacity under 42 U.S.C. § 1983 for prospective injunctive relief pursuant to *Ex Parte Young*. Cu Boulder, through Chancellor Schwartz, can and must be enjoined from enforcing APS 5065.

109. Any law which restricts the First Amendment must clearly define its prohibitions and clearly establish which conduct is and is not prohibited.

110. APS 5065 is an unconstitutional campus speech code. It prohibits speech that is protected by the First Amendment.

111. Plaintiff and all current and future students have First Amendment rights and those rights are not limited or diminished on campus.

112. A law can be found to be void for vagueness when either: (1) "'fails to provide ordinary people of intelligence a reasonable opportunity to understand what conduct it prohibits'" and (2) "'if it authorizes or encourages arbitrary and discriminatory enforcement.'" *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012)).

113. By failing to define "unwelcome conduct," the University has failed to put students on notice of the specific speech that could constitute a violation of the University's Nondiscrimination Policy. The Policy is unconstitutionally vague and therefore unconstitutional.

114. As written, the Policy fails to put students and employees on notice that their speech could be considered "unwelcome conduct" and violate the Policy.

115. Further, the Policy allows for inconsistent application as there is no definition OIEC investigators can consistently apply to reports to determine whether a respondent's actions constituted "unwelcome conduct" or created a hostile environment for the complainant. Under the current version of the Policy, two different investigators

could potentially come to different conclusions on whether certain conduct violates the Policy.

116. The deposition testimony of Hill and Edwards confirm that the Policy fails to provide guidelines on how to determine what is "unwelcome conduct," what is considered a hostile environment, and what is considered intimidating under the Policy. Leaving these essential determinations to the discretion of the assigned OIEC investigator leads to inconsistent enforcement of the Policy.

117. A bedrock principle of the First Amendment is that any policy or law attempting to control speech must be sufficiently tailored to exclusively abridge unprotected speech. Any policy which fails to distinguish between protected and unprotected speech violates the First Amendment and must be struck down.

118. Here, the Policy violates the First Amendment. By its plain terms, the Policy applies to protected speech; it is unconstitutionally overbroad. Virtually any opinion or belief, regardless of the speaker's intent, could be classified as "unwelcome" and constitute harassment or discrimination under the Policy.

119. By attempting to limit "unwelcome" speech relating to an individual's race, ethnicity, gender, sexual orientation, etc., the University has created a policy that constitutes an impermissible restraint based on the content and viewpoint of the subject speech.

120. The University has no compelling interest in curtailing such speech. Even if it did, such interest is not narrowly tailored to the type of speech it seeks to restrict.

121. The Policy punishes students for engaging in protected speech with the threat of forced participation in educational courses, removal from campus life,

suspension, or expulsion. The mere possibility and threat of punishment for expressing an opinion, unpopular or not, or satire only serves to chill protected speech by deterring students from speaking their minds on relevant topics and thus limiting students' educational freedom.

122. Equally egregious, the University selectively enforces its Nondiscrimination Policy against students who hold and express conservative viewpoints.

a. For example, when someone complained to OIEC that after the Charlie Kirk assassination, a CU engineering student called his wife a fat pig on more than one occasion because of the person's conservative beliefs. The OIEC did nothing because the student engaged in free speech not targeted toward someone's protected class (which is odd because political belief is a protected class under APS 5065). *See* OIEC Complaint 00182017.

b. As another example, a student member of the local CU chapter of Turning Point USA (coincidentally the organization founded by Charlie Kirk), called his professor a "bitch" in a *private* group chat. The professor wanted CU to further investigate because of Turning Point's political views, but apparently the OIEC conducted a PCM limited to the student's private use of the word "bitch." *See* OIEC Complaint 00132431.

c. As another example, a CU student posted to social media "the Jewish community poses a massive threat to America and the world," but despite how such a statement might be perceived by Jewish students, it was immediately dismissed as free speech. *See* OIEC Complaint 00187935.

d. Finally, a CU graduate student was reported for attending a pro-Hamas event that targeted students and faculty, but OIEC took no action because it was free speech. *See* OIEC Complaint 00137093.

123. The OIEC files are filled with complaints where someone complains about another person's use of foul language but nothing more, but name calling is free speech. As a practical matter, OIEC is acting as the speech police to enforce the unconstitutional speech code, APS 5065.

124. Plaintiff Johnson was referred to OIEC for violating the Policy after engaging in protected speech by asking a clarifying question about Pride Day at choir rehearsal and about an article of clothing a student wore to class.

125. The OIEC advised Johnson it was not investigating her and she did not violate APS 5065. One would think that this would be sufficient to end the matter entirely, but that's not how OEIC operates. Even when a student does not violate APS 5065, OIEC can still require students to through its informal re-education process.

126. Relying on Provision III(C)1. of the Policy, the OIEC investigator threatened Plaintiff Johnson with sanctions in order to compel her attendance at a meeting with OIEC.

127. Due to the disparate treatment Plaintiff Johnson received by Defendant Swan and OIEC, Plaintiff Johnson is now concerned that she could be punished for simply expressing her opinion or inquiring about "controversial" topics and is less likely to speak on matters of public concern out of fear of further punishment.

128. Ironically, Professor Swanson, who rather obviously violated APS 5065 when it targeted Zoe due to her conservative beliefs (also protected by APS 5065), has

not been investigated or disciplined under the Policy. A conservative who did not violate the Policy was punished while a liberal who did violate the Policy was not.

129. The University's policy and Schwartz' enforcement of the policy violates the First Amendment.

130. Plaintiff Johnson prays that this Court permanently enjoins Chancellor Schwartz from enforcing APS 5065 at CU Boulder.

**COUNT II: 42 U.S.C. § 1983 (FIRST AMENDMENT RETALIATION)**
(Against Defendant Swanson)

131. Plaintiff Johnson realleges and incorporates by reference paragraphs 1-106 as though fully set forth herein.

132. To establish a claim for First Amendment retaliation, a plaintiff must plead: "(1) that the 'plaintiff was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2010)

133. Plaintiff Johnson engaged in constitutionally protected First Amendment activity when she asked questions during choir ensemble regarding the significance of a Pride celebration and an article of clothing another student was wearing.

134. Plaintiff was not engaged in activity that a college may regulate or restrict – she did not engage in obscenity, she did not target her speech to anyone in particular or in a way that could be viewed as inciting violence, and she did not disrupt the classroom setting.

135. For engaging in the above-described protected activity, Defendant Swanson referred Plaintiff Johnson to the University's OIEC and encouraged other University choir students to file their own complaints against Plaintiff Johnson in order to punish Plaintiff Johnson and prevent her from engaging in similar activity in the future.

136. Defendant Swanson referred Plaintiff Johnson to OIEC for punishment and encouraged other students to file complaints against Plaintiff Johnson specifically because Johnson engaged in protected First Amendment speech that Swanson did not approve of. Defendant Swanson, who identifies as liberal and has profound illiberal beliefs, targeted Plaintiff Johnson, a conservative, because she did not agree with Plaintiff Johnson's speech and wanted to punish her for expressing her Conservative views.

137. Defendant Swanson reporting Plaintiff Johnson to OIEC and encouraging other students to report Plaintiff Johnson was a direct consequence of Plaintiff Johnson engaging in protected First Amendment activity and constitutes unlawful retaliation.

138. Swanson's action had a chilling effect on Johnson and would have a chilling effect on anyone in her situation. No reasonable person would ask questions in class or speak with other classmates or express her views on race or anything else if it could result in being sent to the OIEC and being forced to undergo a humiliating process.

139. Swanson's actions were motivated by Johnson's engagement in protected activity. Had Johnson remained silent, nothing would have happened to her.

140. Swanson knew that Plaintiff had a First Amendment right to ask questions in class. That's the whole point of higher education.

141. For students such as Zoe Johnson who did absolutely nothing wrong, the process is the punishment.

142. Plaintiff suffered damages because of Swanson's retaliation.

**COUNT III: 42 U.S.C. § 1983 (FIRST AMENDMENT RETALIATION)**
(Against Defendant Hill)

143. Plaintiff Johnson realleges and incorporates by reference paragraphs 1-106 as though fully set forth herein.

144. To establish a claim for First Amendment retaliation, a plaintiff must plead: "(1) that the 'plaintiff was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2010)

145. Plaintiff Johnson engaged in constitutionally protected First Amendment activity when she asked questions during choir ensemble regarding the significance of a Pride celebration and an article of clothing another student was wearing.

146. Plaintiff was not engaged in activity that a college may regulate or restrict – she did not engage in obscenity, she did not target her speech to anyone in particular or in a way that could be viewed as inciting violence, and she did not disrupt the classroom setting.

147. Defendants Hill and Defendant Edwards worked in concert when handling OIEC's investigation into the complaints against Plaintiff Johnson. Defendants Hill and Edwards consulted each other at all times throughout the investigation, and one did not act without first communicating with the other.

148. Defendant Hill told Johnson she did not violate APS 5065 and that she was not under investigation. Hill knew that Zoe engaged in speech protected by the First Amendment and she knew that the actions (asking questions in a classroom setting, etc.) were protected.

149. Despite not doing anything wrong, Defendant Hill forced Zoe to attend a re-education session under threat of administrative suspension.

150. Plaintiff Johnson was engaging in First Amendment activity when she expressed her refusal to attend a meeting with OIEC.

151. In response to Plaintiff Johnson engaging in protected activity (i.e., stating her intent to not meet with OIEC), Defendant Hill threatened to put an academic hold on Plaintiff Johnson's student account until she submitted and agreed to meet with OIEC.

152. Defendant Hill specifically threatened to punish Plaintiff Johnson because she engaged in protected activity.

153. When Plaintiff Johnson met with Defendants Hill and Edwards, the Defendants repeatedly admonished Plaintiff Johnson for engaging in protected First Amendment speech that OIEC did not approve of and warned Plaintiff Johnson that if she did not censor her own speech in the future, she would continue to have issues with OIEC.

154. Defendant Hill disciplined Johnson knowing Johnson did nothing wrong and knowing she had no authority to do so.

155. Defendant Hill's retaliatory actions against Plaintiff Johnson have caused her to suffer damages. For students such as Zoe Johnson, the punishment is the process.

156. Plaintiff Johnson prays that this Court enter a judgment awarding her monetary damages for the damage caused by Defendant Hill.

**COUNT IV: 42 U.S.C. § 1983 (FIRST AMENDMENT RETALIATION)**
(Against Defendant Edwards)

157. Plaintiff Johnson realleges and incorporates by reference paragraphs 1-106 as though fully set forth herein.

158. To establish a claim for First Amendment retaliation, a plaintiff must plead: "(1) that the 'plaintiff was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2010)

159. Plaintiff Johnson engaged in constitutionally protected First Amendment activity when she asked questions during choir ensemble regarding the significance of a Pride celebration and an article of clothing another student was wearing.

160. Plaintiff was not engaged in activity that a college may regulate or restrict - she did not engage in obscenity, she did not target her speech to anyone in particular or in a way that could be viewed as inciting violence, and she did not disrupt the classroom setting.

161. Defendants Edwards and Defendant Hill worked in concert when handling OIEC's investigation into the complaints against Plaintiff Johnson. Defendants Edwards and Hill consulted each other at all times throughout the investigation, and one did not act without first communicating with the other. Defendant Edwards played an active role in the decision making process throughout OIEC's investigation into Plaintiff Johnson.

162. Defendant Hill, after consulting with Defendant Edwards, told Plaintiff Johnson she did not violate APS 5065 and that she was not under investigation. Edwards knew that Zoe engaged in speech protected by the First Amendment and she knew that the actions (asking questions in a classroom setting, etc.) were protected.

163. Despite not doing anything wrong, Defendant Hill, after consulting with Defendant Edwards, forced Zoe to attend a re-education session under threat of administrative suspension.

164. Plaintiff Johnson was engaging in First Amendment activity when she expressed her refusal to attend a meeting with OIEC.

165. In response to Plaintiff Johnson engaging in protected activity (*i.e.*, stating her intent to not meet with OIEC), Defendant Hill, after consulting with Defendant Edwards, threatened to put an academic hold on Plaintiff Johnson's student account until she submitted and agreed to meet with OIEC.

166. Defendant Hill, after consulting with Defendant Edwards, specifically threatened to punish Plaintiff Johnson because she engaged in protected activity.

167. When Plaintiff Johnson met with Defendants Hill and Edwards, the Defendants repeatedly admonished Plaintiff Johnson for engaging in protected First Amendment speech that OIEC did not approve of and warned Plaintiff Johnson that if she did not censor her own speech in the future, she would continue to have issues with OIEC.

168. Defendant Edwards disciplined Johnson knowing she had no authority to do so. Edwards disciplined Johnson knowing Johnson did nothing wrong.

169. Defendant Edwards' retaliatory actions against Plaintiff Johnson have caused her to suffer damages. For students such as Zoe Johnson, the punishment is the process.

170. Plaintiff Johnson prays that this Court enter a judgment awarding her monetary damages for the damage caused by Defendant Edwards.

## **JURY TRIAL DEMAND**

171. Plaintiff Johnson demands a jury trial on all counts so triable.

## **PRAYER FOR RELIEF**

Plaintiff Johnson prays this Court enters judgment in her favor and awards the following relief:

i. A preliminary and permanent injunction barring Chancellor Schwartz from enforcing APS 5065 at CU Boulder;

ii. Monetary damages against Defendants Swanson, Hill, and Edwards;

iii. Punitive damages against Defendants Swanson, Hill, and Edwards;

iv. Attorney's fees and costs pursuant to 42 U.S.C. § 1988, and all other applicable law against all Defendants; and

v. Any further relief this Court deems necessary and appropriate.

Dated: April 9, 2026.

Respectfully submitted,

*/s/ Geoffrey N. Blue*

Geoffrey N. Blue
Colorado Bar No. 32684
Scott Gessler
Colorado Bar No. 28944
**Gessler Blue Law**
Attorneys for Plaintiff
7350 E. Progress Pl., Suite 100

Greenwood Village, Colorado 80111
720.647.5320
gblue@gesslerblue.com
sgessler@gesslerblue.com

*/s/ Matthew Sarelson*
Matthew Seth Sarelson
Florida Bar 888281
**DHILLON LAW GROUP INC.**
Attorneys for Plaintiff
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
305.773.1952
msarelson@dhillonlaw.com

*/s/ John-Paul S. Deol*
John-Paul S. Deol
California Bar 284893
**DHILLON LAW GROUP INC.**
Attorneys for Plaintiff
177 Post Street, Suite 700
San Francisco, California 94108
415.741.7935
jpdeol@dhillonlaw.com

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2026, the foregoing was electronically served via CM/ECF on all parties who have entered an appearance in this matter via their counsel of record.

*/s Joanna Bila*
Joanna Bila, Paralegal