**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Case No.: 1:25-cv-00390-GPG-NRN

**ZOE JOHNSON,**

Plaintiff,

v.

**ELIZABETH K. SWANSON, *et al.*,**

Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT SWANSON'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Zoe Johnson hereby files her response to Defendant Elizabeth K. Swanson's Motion for Judgment on the Pleadings [D.E. 111] and states as follows:

## INTRODUCTION

Swanson asks this Court to dismiss Johnson's First Amendment retaliation claim on the pleadings, arguing that her actions were nothing more than routine compliance with mandatory reporting obligations and that her actions did not constitute adverse action sufficient to state a claim. Her characterization of the facts fundamentally misrepresents the allegations in the Second Amended Complaint ("SAC") [D.E. 102]. Specifically, Swanson contends judgment on the pleadings is appropriate for two reasons: (1) the SAC fails to allege a claim for First Amendment retaliation because her conduct—referring a student to a disciplinary office, encouraging other students to file complaints against that student, threatening removal from the choir ensemble, and coaching students on what to write in their reports—did not constitute adverse action under the First Amendment, and (2) she is entitled to qualified immunity because no clearly established law existed which could have put her on notice that her conduct could give rise to First Amendment liability.

Both arguments fail. Swanson did not passively receive student complaints and forward them to the OIEC as a matter of routine obligation. Rather, she actively encouraged and coached students to file reports against Johnson because she disagreed with the content of Johnson' speech. Elizabeth Swanson intentionally targeted Zoe Johnson because of Zoe's political and religious beliefs – it is well-established that the First Amendment prohibits this.

## LEGAL STANDARD

District courts treat a motion for judgment on the pleadings as a motion to dismiss under Rule 12(b)(6) and apply the same standard to both motions. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). When ruling on a motion to dismiss, the court "assume[s] the truth of the plaintiff's well-pleaded factual allegations and view[s] them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Choosing to "[a]ssert a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). At the motion to dismiss phase, "'it is the defendant's conduct as *alleged in the complaint* that is scrutinized for [constitutionality].'" *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L.Ed.2d 773 (1996)).[1]

[1] Swanson claims that there is a "heightened pleading standard" when a defendant raises qualified immunity at the pleading stage. Mot. at 5–6. The Tenth Circuit expressly rejected a heightened pleading requirement. *Currier v. Doran*, 242 F.3d 905, 912 (10th Cir. 2001) (noting that *Crawford-El v. Britton*, 523 U.S. 574 (1998) overruled this Circuit's heightened pleading requirement).

**FACTS**

Until her recent graduation, Johnson was a fourth-year undergraduate student at CU Boulder and former member of the choir ensemble led by Defendant Swanson. SAC at ¶¶ 72–74. Johnson identifies as politically and religiously conservative. *Id.* at ¶ 73. Swanson is profoundly liberal. *Id.* at ¶ 79. In September 2022, Swanson singled out Johnson after a fellow choir student complained to Swanson that Johnson made a comment valuing individuals over identity. In response, Swanson sent unsolicited emails to three students asking if the comment struck them "negatively," and described Johnson's remark as "ignorant and insensitive," and then met privately with Johnson to shame her for her "white privilege." *Id.* at ¶¶ 76–78.

In Fall 2024, Johnson again joined Swanson's choir ensemble. *Id.* at ¶ 80. It did not take long for issues to arise between Johnson and Swanson again, and Swanson targeted Johnson for a second time. *Id.* at ¶ 80. During a rehearsal, Plaintiff asked a question about LGBTQ Pride: "Why do we need two months of this? Didn't we do this back in June?". *Id.* Several students in the ensemble took offense to Johnson's question and reported her to Swanson. *Id.* Swanson then actively encouraged the students to file OIEC complaints against Johnson. *Id.* at ¶ 81. Then, in or around October 25, 2024, during a class presentation, Johnson made a comment about "reverse racism" to another student. *Id.* at ¶ 83. The student reported Johnson to Swanson, but did not disclose the substance of the comment. *Id.* at ¶ 84. Like before, Swanson emailed the student to encourage her to file an OIEC complaint against Johnson and coached her on what to write. *Id.* at ¶¶ 84–86. (Swanson falsely testified never "encouraged" students to gang up on Zoe. *Id*. at ¶¶ 81, 106). Swanson also filed her own OIEC complaint. *Id.* at 91. Notably,

Swanson did all of this without ever learning the substance of Johnson's comments. Swanson's stated goal, as revealed in her own emails, was for "Zoe to get the message from multiple angles that her behavior is not acceptable and affects others." *Id.* at ¶ 86. Swanson similarly reported Johnson to the OIEC after a student complained about Johnson innocently asking her about a wave cap another student was wearing. *Id.* at ¶ 93. On October 30, 2024, Swanson sent Johnson an email asking if she had time to meet about a "few concerns[,]" but Johnson politely declined. *Id.* at ¶¶ 94–95. When Plaintiff declined to meet with Swanson about vague "concerns," Swanson sent a series of increasingly harassing emails and ultimately threatened to remove Plaintiff from the ensemble. *Id.*

As a direct result of Defendant Swanson's retaliatory conduct, Plaintiff was subjected to an OIEC investigation, threatened with sanctions, forced to attend a mandatory Policy Compliance Meeting—effectively a re-education session—under threat of administrative suspension. *Id.* at ¶¶ 102–05. Had Plaintiff remained silent, none of this would have happened to her.

## **ARGUMENT**

### *Plaintiff Plausibly Pleads a Constitutional Violation Under Worrell*

Swanson first argues that the SAC fails to state a claim for First Amendment retaliation under the Tenth Circuit's *Worrell* framework. To plausibly state a claim under *Worrell*, a plaintiff must plead: (1) she engaged in constitutionally protected activity; (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was

substantially motivated as a response to the protected activity. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

Swanson's Motion concedes the first prong—that Johnson engaged in constitutionally protected activity—and does not even address the third prong—that Swanson's actions were substantially motivated by Johnson's protected activity.[2] Swanson focuses exclusively on the second prong: adverse action, contending that her actions were not severe enough to chill a person of ordinary firmness. Swanson argues that her actions do not rise to the level of an adverse action sufficient to support a First Amendment retaliation claim because no punitive action was taken against Johnson. Mot. at p. 10. Swanson's argument fails because it relies on a sanitized version of the facts that ignores the totality of Swanson's alleged conduct and fails to recognize that the process is the punishment.

Here, the actions taken by Swanson would undoubtedly chill the speech of any person of ordinary firmness. Taking the SAC's allegations as true, Swanson: (1) encouraged at least three choir ensemble students to file formal complaints against Johnson with the OIEC (SAC at ¶ 81); (2) coached a student on what language to use in her report (*Id.* at ¶¶ 85–86); (3) explicitly stated her goal was to punish Johnson "from multiple angles" (*Id.* at ¶ 86); (4) filed two complaints of her own against Johnson (*Id.* at ¶¶ 91, 93); and (5) threatened Johnson's membership in the choir ensemble if she did not speak with Swanson (*Id.* at ¶ 95).

But most egregious, Swanson did all of the above without ever knowing the exact words Johnson said or determining whether Johnson's speech violated any University

---

[2] Swanson fails to address the substantial motivation prong because Swanson's emails show she was substantially motivated by Johnson's speech. SAC at ¶ 86.

policy or implicated the First Amendment. *Id.* at ¶ 92. Getting Zoe because of her beliefs was the goal, not any attempt to learn the truth. The SAC expressly alleges that Swanson targeted Johnson because she did not agree with the content and viewpoint of Johnson's speech. As a direct result of Swanson's animus towards Johnson, she was forced to attend a meeting with the OIEC where she was told by University faculty that she needs to alter her speech. *Id.* at ¶¶ 102–05. Swanson's actions had a significant impact on Johnson because she "now lives in fear" that she could be punished again for merely asking harmless questions. *Id.* at ¶ 104.

These allegations depict a professor who deliberately targeted a student because of her conservative viewpoints, actively manufactured a paper trail of complaints against Johnson, coached witnesses, threatened her with removal from a program, and referred her to the University's speech police where she was forced to undergo re-education. Swanson's actions go well beyond complying with her responsibilities as a mandatory reporter, she made it her ultimate goal to make sure Johnson was punished for merely expressing her beliefs. Under what circumstances should having the audacity to ask a question in a college class get you sent to the campus' speech policy?

A person of ordinary firmness would unquestionably be chilled from exercising her First Amendment rights under these circumstances. *See Worrell*, 219 F.3d at 1212 ("[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, *threatened prosecution*, bad faith investigation, and legal harassment, constitutes an infringement on that freedom.") (emphasis added); *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007) (holding verbal threats could, under Tenth Circuit precedent, chill a person of ordinary firmness from continuing to engage in protected activity); *I.G. by*

*and through Grunspan v. Jefferson Cnty. Sch. Dist. through Bd. of Educ. for Jefferson Cnty. Sch. Dist.*, 452 F. Supp. 3d 989, 1005 (D. Colo. 2020) (denying a motion to dismiss because a school principal complaining about the plaintiff to teachers and other school staff was an adverse action that "could chill the speech of a person of ordinary firmness"); *Thompson v. Ohio State Univ.*, 92 F. Supp. 3d 719, 734 (S.D. Ohio 2015) (acknowledging that a teacher's referral to the Office of Student Conduct for an alleged violation of the terms of a student's suspension constituted an adverse action for First Amendment retaliation purposes); *Holloman v. Harland*, 370 F.3d 1252, 1269 (11th Cir. 2004) (explaining "comments . . . coming from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights."); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) ("Even if an official lacks actual power to punish, the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill.").

Notably, Swanson does not include citations to *any* cases where a student was retaliated against by her teacher or another member of a university's faculty and relies on numerous irrelevant cases. First, *Lincoln v. Maketa*, 880 F.3d 533 (10th Cir. 2018), involved police officers alleging a First Amendment retaliation claim after they were: placed on administrative leave, "humiliated" after they were escorted out of the workplace and stripped of their equipment, and subjected to internal affairs investigations after they complained about improper workplace practices. 880 F.3d at 536, 541. Importantly, the Tenth Circuit did not actually analyze the Defendants' conduct under *Worrell* and strictly limited its holding to the clearly established prong of the qualified immunity analysis. *Id.*

at 544. *Lincoln* never addressed whether a workplace investigation could chill a person of ordinary firmness from continuing to engage in protected activity.

Second, Swanson cites *Houston Community College Systems v. Wilson*, 595 U.S. 468, 477 (2022), a case involving the free speech rights of an elected official, not a university student. *Id.* at 471. The distinction is key because the Court expressly limited its holding to the facts of the case by emphasizing that the censure of an elected official carries different First Amendment implications than actions taken by school administrators. *Id.* at 479 ("The censure at issue before us was a form of speech by elected representatives. It concerned the public conduct of another elected representative."). Further, the conduct at issue in *Wilson* is completely different from this case. Here, Swanson did not merely express disapproval of Johnson's speech; she actively manufactured institutional processes designed to punish her.

Next is *Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001). There, the plaintiff sued for First Amendment retaliation after the University's athletic director allegedly attempted to censor the plaintiff's website. *Id.* The district court dismissed the complaint, *Id.* at 1173, and the Tenth Circuit affirmed dismissal. *Id.* at 1177. The court held that the athletic director's actions would not "chill a person of ordinary firmness from continuing to publish an internet site" because he did nothing to prevent plaintiff from engaging in protected speech. *Id.* Unlike *Smith*, Swanson succeeded in chilling Johnson's speech after she targeted her and referred her to the OIEC for punishment. SAC at ¶ 104 ("[Johnson] now lives in fear that anything she says" could violate the University's speech code).

Further, Swanson's reliance on *Bhattacharya v. Murray*, 93 F.4th 675 (4th Cir. 2024) is also misplaced. Though *Bhattacharya* involves a student claiming First

Amendment retaliation against university faculty, the case is factually dissimilar from Johnson's case. Throughout its opinion, the Fourth Circuit repeatedly highlighted that the university took action against the plaintiff because of his *unprofessional conduct*, and not his speech. *Id.* at 698. Here, Swanson retaliated against Johnson based on the content of her speech, and not her conduct or the way she conveyed the speech.

Finally, Swanson cites *Lowery v. Mills*, 157 F.4th 729 (5th Cir. 2025), for the notion that "'mere accusations or criticism,' 'investigations,' 'false accusations,' 'rude statements,' and a 'colleague's reporting him to the police' caused the plaintiff discomfort, but did not amount to action adverse enough to establish a retaliation claim." Mot. at p. 10 (quoting *Lowery*, 157 F.4th at 743). *Lowery* involved a claim for First Amendment retaliation in the employment context and thus, under Fifth Circuit precedent, only required the plaintiff to prove he "suffered an adverse employment action." 157 F.4th at 743. Like *Lincoln*, *Lowery* is silent on whether the plaintiff suffered an adverse action which caused him to "suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[,]" which *Worrell* requires.

Accordingly, Johnson has sufficiently alleged that she suffered an injury that would chill a person of ordinary firmness from continuing to engage in First Amendment activity, and Swanson's motion must be denied.

*Swanson Violated Clearly Established First Amendment Precedent*

Swanson then argues that even if she did violate Johnson's First Amendment rights, Johnson's rights were not clearly established at the time of the violation. Swanson's argument rests on an incredibly narrow and incorrect reading of both First Amendment and qualified immunity caselaw to prove that Johnson's constitutional rights

were not clearly established. Supreme Court and Tenth Circuit precedent – not to mention common sense – establish that university staff cannot punish speech based on its content and a student cannot be punished for merely expressing her First Amendment right to free speech by asking two harmless questions in a classroom setting.

"[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A right is clearly established "when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotations omitted).

It is axiomatic that the "general right to be free from retaliation for one's speech" exists. *Reichle v. Howards*, 566 U.S. 658, 665 (2012). After all, "[t]he essence of the First Amendment is to allow all parties the opportunity for attempts to persuade as well as the opportunity for robust, even hostile, exchanges of conflicting views." *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996). In the context of academia, "[i]t is well established that students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Id.* (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 509 (1969)). "[Students] cannot be punished merely for expressing their personal views on the school premises[.]" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 512–13). These protections extend to

public universities which cannot punish “the mere dissemination of ideas—no matter how offensive to good taste[.]” *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

The scope of a student’s First Amendment rights at a public school begins with *Tinker*, where the Court held a school’s ability to regulate a student’s speech ultimately turns on whether the speech “substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students.” *Tinker*, 393 U.S. at 506. If the student’s speech, regardless of whether it occurs inside or outside the classroom, “materially disrupts classwork or involves substantial disorder or invasion of the rights of others” then such speech “is, of course, not immunized by the constitutional guarantee of freedom of speech.” *Id.* at 513. *Tinker* creates the clearly established principle that students can ask harmless questions and express themselves in a classroom setting without the fear of being retaliated against and punished based on the content of their protected speech. *See Tinker*, 393 U.S. at 514.

Here, Johnson engaged in speech is protected by *Tinker* when she: (1) questioned her choir class’s lesson on LGBTQ Pride by asking: “Why do we need two months of this? Didn’t we do this back in June?”; (2) when she discussed the topic of “reverse racism” with one of her classmates; and (3) when she asked one of her choir classmates about the wave cap another classmate was wearing as she had never seen one before. SAC at ¶¶ 81, 83, 93. All remarks were harmless and did not disrupt Swanson’s choir class, as Swanson never actually learned the substance of any of Johnson’s comments at the time she and the other students filed their complaints with OIEC. *Id.* at ¶¶ 84, 87.

This Circuit's precedent also establishes that Johnson had a clearly established right to be free from retaliation. In *Seamons*, a high school football player was hazed by his teammates in front of the rest of his team. 84 F.3d at 1230. He reported the hazing incident to school administrators, including the team's coach. But instead of punishing the other students, the coach kicked plaintiff off the team. *Id*. The plaintiff sued for First Amendment retaliation, but the district court found that the coach was entitled to qualified immunity. *Id.* at 1231. On appeal, the Tenth Circuit, under the *Tinker* framework, held that the "Defendants violated clearly established law when [plaintiff] was dismissed from the football team because of his speech" and rejected qualified immunity for the defendants. *Id.* at 1238.

Similarly, in *Thompson v. Ragland*, a more recent *Tinker* adjacent opinion from the Tenth Circuit, the court recognized it was clearly established that "discipline cannot be imposed on student speech without good reason." 23 F.4th at 1260. In *Thompson*, the plaintiff sent an email to her classmates advising them to complete their course evaluations with honest feedback regarding the course after a dispute with the professor forced her to drop the course. *Id.* at 1254. Shortly thereafter, the plaintiff received a letter from a university administrator that she was under investigation for potentially violating the university's code of conduct and restricted from discussing the chemistry class with any student at the university and under a no contact order with the professor of the course. *Id.* at 1255. Plaintiff sued the administrator, alleging a First Amendment violation, but the district court held that the administrator did not violate clearly established law and was therefore entitled to qualified immunity. *Id.* at 1253. On appeal, the Tenth Circuit, reversed, holding that the plaintiff's "speech was restricted. And there [was] no legitimate

basis for th[e] restriction." *Id.* at 1259. The Tenth Circuit found that the administrator failed to prove how the plaintiff's email caused a disruption at the school, and, therefore, was not entitled to qualified immunity. *Id.* at 1260.

Here, like the plaintiffs in *Seamons* and *Thompson*, Johnson was punished for engaging in protected speech under the *Tinker* framework by asking two harmless questions about her choir class's curriculum and a classmate's headwear, and discussing a social issue with a classmate. There is no evidence that either one of Johnson's questions caused any disruption in the classroom. Indeed, the students who reported Johnson did not immediately object, but instead waited until after class was over before reporting her to Swanson. Meanwhile, classes proceeded as normal.

Swanson attempts to argue that *Thompson* is inapplicable because "it involve[d] punitive sanctions issued by a decision-maker concerning a student conduct violation." Mot. at 9. But the allegations here involve sanctions as well: threatening removal from the ensemble, orchestrating complaints designed to trigger an institutional disciplinary process, threatening Johnson to be locked out of the registration system, and forcing Johnson to attend a mandatory re-education session under threat of suspension. SAC at ¶¶ 85–86, 95, 100, 102–04. These are not qualitatively different from the sanctions identified above in *Thompson*.

Swanson also cites to *Pompeo v. Board of Regents of the University of New Mexico*, 852 F.3d 973 (10th Cir. 2017), and *Hunt v. Board of Regents of the University of New Mexico*, 792 F. App'x 595 (10th Cir. 2019) to support her argument. But both cases are irrelevant to the Court's qualified immunity analysis. First, *Pompeo* involved an exception to *Tinker* "school sponsored speech," or "speech that a school affirmatively

promotes, as opposed to speech that it tolerates." *Id.* at 982. Here, no party is suggesting Johnson's speech was school sponsored. Second, *Hunt* is distinguishable because it involved speech which occurred online, and not in a classroom. In *Hunt*, a graduate student was sanctioned for engaging in unprofessional conduct in a Facebook post. *Id.* at 598–99. The crux of the Tenth Circuit's ruling was "the law was unsettled regarding whether students could be held accountable for 'off-campus, online speech for the purpose of instilling professional norm.'" *Thompson*, 23 F.4th at 1261 (quoting *Hunt*, 792 F. App'x at 605). Unlike *Hunt*, Johnson's speech occurred neither off campus nor on social media; it occurred in Swanson's *classroom*.

Finally, Swanson cites *Stepp v. Lockhart*, 168 F.4th 1286 (10th Cir. 2026), a recent Tenth Circuit case. Any citation to or attempt to rely on this case is improper because the qualified immunity analysis is limited to cases that were decided at the time the alleged constitutional violation occurred. *See, e.g.*, *Lewis v. City of Edmond*, 48 F.4th 1193, 1199 (10th Cir. 2022) ("[W]e remain mindful that cases decided after Lewis's death are of '*no use* in the clearly established inquiry.'") (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021)); *Clay v. Bd. of Trs. of Neosho Cnty. Cmty. Coll.*, 905 F. Supp. 1488, 1496 (D. Kan. 1995). A case decided in March 2026 cannot provide this Court any guidance whatsoever on whether the violation of a constitutional right which occurred in November 2024 was clearly established or not.

In sum, Swanson's motion conflates "clearly established" with "factually identical." The Supreme Court has repeatedly rejected the requirement that a plaintiff identify a case with identical facts. *Hope*, 536 U.S. at 741. Every reasonable university professor in November 2024 would have known that deliberately manufacturing disciplinary

complaints against a student because of her political viewpoints, coaching witnesses, threatening removal from a program, and filing complaints without even knowing what the student said, violated the First Amendment. *See Douglass v. Garden City Cmty. Coll.*, 652 F. Supp. 3d 1329, 1345 (D. Kan. 2023) ("In the Tenth Circuit, the law has been clearly established since at least 2000 that Section 1983 prohibits retaliation for exercising constitutionally protected rights under the First Amendment.") (citing *Worrell*, 219 F.3d at 1212 and *Nave v. Indep. Sch. Dist. No. 20 of LeFlore Cnty.*, No. CIV-17-096-KEW, 2018 WL 6419296, at *9 (E.D. Okla. Dec. 6, 2018)). A university professor does not need a case directly on point to know that viewpoint-based retaliation is unconstitutional.

Finally, Swanson was never faced with a "Hobson's choice" as she claims. There is a material difference between so-called good-faith mandatory reporting and actively targeting a student over different political views. (Swanson never heard Johnson's comments; she acted exclusively on hearsay).[3] Nothing contained in APS 5065 requires or permits Swanson to coach students on what to say, encourage students to file complaints, and threaten to remove Johnson from the choir ensemble.

## CONCLUSION

For the foregoing reasons, Swanson's Motion for Judgment on the Pleadings should be denied.

Respectfully submitted,

/s/ Matthew Sarelson
Matthew Seth Sarelson
Florida Bar 888281
**DHILLON LAW GROUP INC.**
Attorneys for Plaintiff

[3] Moreover, Johnson is unaware of any "good-faith mandatory reporting defense" to a First Amendment retaliation claim; and if even such defense is available, it could not be raised in a motion for judgment on the pleadings. If Swanson wants to claim she was just following orders, she can do it in front of a jury.

1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
305.773.1952
msarelson@dhillonlaw.com

/s/ Geoff Blue
Geoff Blue
Colorado Bar No. 32684
Scott Gessler
Colorado Bar No. 28944
**Gessler Blue Law**
Attorneys for Plaintiff
7350 E. Progress Pl., Suite 100
Greenwood Village, Colorado 80111
720.647.5320
gblue@gesslerblue.com
sgessler@gesslerblue.com